**Lee Roy GIDDENS, d/b/a Shreveport Salvage Pool, et al.**

v.

**CITY OF SHREVEPORT, et al.**

**Civil Action No. 95–315.**

United States District Court,
W.D. Louisiana,
Shreveport Division.

Aug. 24, 1995.

Huey L. Golden, Shreveport, LA, for Lee Roy Giddens, Kenneth R. Barlow, South Caddo Wrecker Service, Inc., Reynolds Kar Kare, Inc., Jim Smith, Porterfield Towing Service, Inc., Northside Towing Service, Inc., Bossier Sales & Salvage, Inc., L.C. Dotie, James Rial, Robert J. Scholzen, Southern Towing Service, Inc.

Lydia Maria Rhodes, Office of City Attorney, Shreveport, LA, for City of Shreveport.

Arthur R. Carmody, Jr., Wilkinson Carmody & Gilliam, Shreveport, LA, for Twin City Salvage Pool, Inc.

## ORDER

WALTER, District Judge.

For the reasons stated in the Report and Recommendation of the Magistrate Judge previously filed herein, having thoroughly reviewed the record and the objections filed by the parties and concurring with the Magistrate Judge's findings under the applicable law;

**IT IS ORDERED** that plaintiffs' motion for a preliminary injunction is **DENIED.**

## *FINDING AND RECOMMENDATION*

PAYNE, United States Magistrate Judge.

The plaintiffs are various individuals and companies engaged in the business of vehicle towing and/or the storage of towed vehicles. They instituted this action in state court, seeking to enjoin on federal and state law grounds the enforcement of recent amendments to the City of Shreveport ("the City") ordinance which regulates vehicle towing and the storage of towed vehicles. Because of the presence of federal constitutional issues, the defendants, the City and Twin City Salvage Pool, Inc. ("Twin City"), removed the action to this court. An evidentiary hearing on plaintiffs' request for a preliminary injunction was held on March 6, 1995, and the parties have submitted briefs on the legal issues. For the reasons set forth below, the plaintiffs have failed to establish a substantial likelihood of prevailing on the merits of any of their federal and state law claims. Therefore, it is recommended that plaintiffs' motion for a preliminary injunction be **DENIED.**

### (I) FACTS

#### (A) *Vehicle Towing Practices*

As established at the evidentiary hearing, there are three distinct kinds of vehicle towing situations that regularly arise on the streets of Shreveport, Louisiana. "Prefer-

ence tows" occur when the operator of a disabled vehicle expresses a desire to have his vehicle towed by a designated company. For example, after an automobile accident, Shreveport police routinely ask the operator of any disabled vehicle if he prefers to have his car towed by a specific company. If the operator responds in the affirmative, the designated towing company is summoned, and the fees and terms of the towing engagement are negotiated between the vehicle owner and the towing company. For the most part, the issues in this case do not involve preference tows. The ordinance at issue, Article V, Chapter 102 of the Code of Ordinances of the City of Shreveport, addresses two other types of towing situations, "no preference" tows and tows of impounded vehicles.

"No preference" tows occur when the owner of the disabled vehicle does not request a specific towing service. In such cases, the Shreveport Police Department ("SPD") maintains a rotational list of approved towing companies, and contacts the next company on the list. A similar situation arises when vehicles are impounded by SPD, including abandoned vehicles and vehicles seized as evidence or because of a legal violation. The towing of impounded vehicles is also handled on a rotational list basis. "No preference" tows and impound tows are subject to substantially more regulation by the City than preference tows. For example, the ordinance establishes a rate schedule that limits the amount that tow truck operators may charge for "no preference" and impound tows, but it does not regulate the fees that may be charged for preference tows.

The rotational list procedure for "no preference" and impound tows is not new. To the contrary, it has been an established practice in Shreveport for many years. Furthermore, the City has regulated the practices of private towing companies by ordinance since at least 1985. The plaintiffs (some of whom are towing companies on the rotational list) do not challenge the rotational procedure itself, but instead attack recent amendments

to the ordinance pertaining to the storage of "no preference" and impound vehicles.

(B) *Storage Practices Prior to the 1994 Amendments*

Prior to the recent amendments to the towing ordinance, discussed below, the storage of "no preference" and impound vehicles was not regulated by the City. If the owner of a "no preference" vehicle gave no instructions for storage, the towing company would generally store the vehicle at its own storage yard or at a contract storage facility.[1] There was no legal requirement that such storage facilities be located within the City, and a number were not. Assuming that the owner was not at the scene when the vehicle was towed (often the case for hospitalized accident victims and the owners of impound vehicles), the owner was required to call SPD to determine the location of his vehicle. This information was usually noted on the police report, but often was not available to SPD dispatchers handling after-hours calls. Particularly in instances involving towing companies that did not have their own storage facilities, SPD officers receiving such inquiries were also sometimes required to make additional inquiries in order to determine the location of the vehicle.

As early as 1990, city officials, including then Chief Administrative Officer ("CAO") Newton Bruce, began considering the wisdom of a central storage facility within the city limits for "no preference" and impound tows. One of the reasons that Bruce came to advocate such a change was that vehicles were being towed to locations well outside the city limits. In a memorandum to city council members dated January 4, 1994, in which he advocated the adoption of the changes to the ordinance which are at issue in this case, Bruce stated:

A major and continual problem ... was the issue of storage outside the city limits. That a citizen's car may be towed to Stonewall without his knowledge is an inconvenience to not only the citizen but law enforcement, insurance adjusters, and repair

---

1. Some businesses, such as plaintiffs Porterfield Towing Service, Inc., and Rials Muffler and Auto, engaged in both towing and storage. Other businesses, such as Shreveport Salvage Pool,

did not have their own tow trucks but provided storage for those towing companies that did not have their own storage facilities.

958

shops. A recent case, in which a tow company ceased operations without notice to the City, graphically illustrates a need for change. This company was holding several vehicles impounded by the Police Department. Under the current ordinance, we have no contractual basis or other basis to question the disposition of the cars we are responsible for storing. It is possible, based on the little we have learned, that some of these cars may have been sold to a dismantler. . . .

Several alternatives have been discussed, all of which have their own set of problems, but limiting storage to a single location inside the city limits offers the best balancing of the interests of citizens, the City and the industry.

The SPD's Property Management Bureau maintains the rotational list and supervises towing operations in order to assure compliance with permit requirements and other matters governed by the towing ordinance. Sgt. Richard Salley heads the Bureau, and testified regarding the factors which led the City to favor central storage of "no preference" and impound vehicles. In addition to the concern that vehicles were being towed to locations outside the city limits, SPD also sometimes experienced delays or difficulty responding to the inquiries of owners regarding where their vehicles had been towed. Also, police officers inspecting impounded vehicles pursuant to criminal investigations were required to spend a significant amount of time travelling between storage locations, a problem which could be eliminated by a single storage facility. Finally, because storage facilities were unregulated, the City could not impose requirements regarding the conditions of storage, such as security and twenty-four hour access.

With these concerns in mind, the City solicited bids for a central storage facility in June, 1993. Among other things, the bid specifications required "a secure facility with a minimum storage capacity of 1000 vehicles without stacking" that was "surrounded by some type of sight obstruction acceptable to the City that prevents the stored vehicles from being seen from nearby streets or residences." The facility was required to be located within the city limits, and to have the capacity to "receive and immediately secure vehicles at any time of the day or night without undue delay to the towing company." The operator was also required to maintain a computerized vehicle storage, tracking and inventory system approved by the SPD, to maintain at least $1,000,000.00 in insurance coverage, and to make payments to the city "for the right to store vehicles under this contract."

Six companies replied to the central storage proposal, and the two finalists were plaintiff Shreveport Salvage and defendant Twin City. In August, 1993, the CAO advised Twin City that it had been selected to provide the central storage facility. The City's contract with Twin City was adopted by the city council in November, 1994, and the towing ordinance was amended to provide in § 102–344(J) that:

All vehicles which are classified as impounds or no-preference shall be towed to a location designated by the City of Shreveport. [§ 102–344(J)]

In order to carry out the contract, Twin City acquired twenty acres of land on Greenwood Road in Shreveport, and enclosed the property with an eight foot high metal fence with automatic gates. The facility began operating in December, 1994, and has received for storage approximately 950 "no preference" or impound vehicles since that time. Twenty-four hour access is provided, and the company has installed the computer monitoring system required by the City.

On December 27, 1994, new City CAO Wendell Collins sent a written memorandum to all tow truck operators advising that "[a]fter January 1, 1995, all towing and wrecker services requesting participation on the City's 'rotational' list must agree to abide by the limitation of rates for towing services . . . and use of the City's central storage facility." The memorandum also states that "[i]f you are called by the Shreveport Police Department on a 'no preference' call from the rotational list, you may not negotiate the storage of the vehicle at a place other than the place directed by the City of Shreveport."

This suit followed in February, 1995. The eleven plaintiffs include four companies engaged in both the towing and vehicle storage business (Barlow's Towing; Porterfield Towing Service, Inc.; Northside Towing Service, Inc.; and Rials Muffler and Auto); four companies involved in towing only (South Caddo Wrecker Service, Inc.; Southern Towing Service, Inc.; Dotie's Towing Service and Reliable Towing Service); two companies engaged in storage only (Shreveport Salvage and Bossier Sales & Salvage, Inc.) and one company which auctions stored vehicles (Insurance Storage and Salvage Pool). The plaintiffs engaged in the storage business attack the constitutionality of the central storage rule on the grounds discussed below. The plaintiffs engaged in the towing business allege that the CAO's December 27, 1994 memorandum, to the extent that it prohibits tow truck operators from "negotiating" the storage location of "no preference" vehicles, violates free speech protections afforded by the First Amendment.

## (II) LAW AND ANALYSIS

### (A) BURDEN OF PROOF

■ In order to obtain the "extraordinary remedy" of a preliminary injunction, the plaintiffs must demonstrate by a "clear showing" that:

(1) they have a substantial likelihood of prevailing on the merits;

(2) there is a substantial threat of irreparable harm if the injunction is not granted;

(3) the threatened injury outweighs any harm that may result from the injunction to the non-movant; and

(4) that the issuance of an injunction will not undermine public interests.

*Allied [Marketing] Group, Inc. v. CDL Mktg. Inc.,* 878 F.2d 806, 809 (5th Cir. 1989).

With this standard in mind, each of plaintiffs' federal and state law claims will now be considered.

## (B) CLAIMS PERTAINING TO THE CENTRAL STORAGE FACILITY

### (1) *Procedural Due Process*

Because of the City's decision that "no preference" and impound vehicles would be stored at a central facility, several area storage facilities that formerly provided storage for such vehicles have lost that aspect of their business. For example, there is no doubt that the change to a central storage facility has impacted the business of Shreveport Salvage, which is located within the city limits. Lee Roy Giddens, the manager of that company, testified that in 1994 he handled the storage of approximately 700 "no preference" or impound vehicles for the City, which accounted for 98–99% of his revenue from vehicle storage. Subsequent to the passage of the ordinance, he has had virtually no vehicle storage business. James Rials and Wyatt Porterfield, Sr. also testified regarding the adverse impact that the ordinance has had on their respective vehicle storage operations (both of which are located outside the city limits).

Citing these adverse economic consequences, plaintiffs argue that the ordinance has deprived them of property without due process of law in violation of the Fourteenth Amendment of the United States Constitution and Art. 1, § 2 of the Louisiana Constitution of 1974. Apparently, plaintiffs contend that their right to store "no preference" and impound vehicles for the City is a vested property right that is entitled to constitutional protection. They may also contend that the ordinance infringes upon their "liberty" interest to pursue the occupation of their choice. These arguments trigger "procedural" due process analysis. Regardless of whether couched in terms of a property or liberty interest, or both, the due process claims are without merit.

### (a) *Property Interest*

In *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), the United States Supreme Court held that in order for a person to have a property interest that is shielded by the Fourteenth Amendment, that person:

... must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

The due process issue to be resolved in this case, then, is whether the plaintiffs have "a legitimate claim of entitlement" to the storage of "no preference" and impound vehicles. Guided by the recent decision of the United States Court of Appeals, Fifth Circuit in *Blackburn v. City of Marshall*, 42 F.3d 925 (5th Cir.1995), the Court concludes that they do not.

Marshall, Texas employs a rotational method for handling "no preference" tows similar to the Shreveport system. Unlike Shreveport, however, Marshall's rotational list is not mandated by ordinance, but results from an arrangement among area tow truck operators and law enforcement authorities. Plaintiff Blackburn brought a number of constitutional claims against the City of Marshall after he was excluded from the rotational list, including deprivation of property and liberty interests under the Fourteenth Amendment. In affirming the district court's Rule 12(b)(6) dismissal of the due process claims, the Fifth Circuit reasoned that "[p]roperty interests are not created by the Constitution; rather, they stem from independent sources such as state statutes, local ordinances, existing rules, contractual provisions, or mutually explicit understandings." 42 F.3d at 936–37. Because no state or local statute, ordinance or regulatory scheme governed the operation of the rotational list, the Court of Appeals concluded that "Blackburn has failed to allege a property interest in remaining on the list." *Id.* at 941.

■ Because the Shreveport rotational system is directly regulated by the City's towing ordinance, *Blackburn* indicates that a towing company could have a cognizable property interest in remaining on the Shreveport list. This case, of course, does not present that question. The inquiry here is whether, prior to the enactment of § 102–344(J), there existed any statute, ordinance or regulation which might be construed as entitling plaintiffs to store "no preference"

and impound vehicles on referral from the City. Plaintiffs have not cited any such provision, and the Court is aware of none. There are state statutes which require law enforcement authorities and owners to be notified when a vehicle has been towed to a storage facility, La.R.S. 32:1718–1721, maintenance of storage records, *id.*, § 1723 and disposal of stored vehicles, *id.*, §§ 1728–1730. Implementing regulations adopted by the Louisiana Department of Public Safety and Corrections (DPSC) regulate storage conditions and set maximum daily storage rates. The referenced statutes and the DPSC regulations generally address consumer concerns regarding stored vehicles, and cannot be construed as granting private businesses a vested property right to store "no preference" and impound vehicles for public entities. And as previously mentioned, the City's towing ordinance did not make any provisions for storage of towed vehicles prior to the 1994 amendment.

In summary, plaintiffs have not established that by virtue of any state or local law, they have a property interest in storing "no preference" and impound vehicles on referral from the City. Accordingly, the "property interest" aspect of their due process cannot be sustained.

### (b) *Liberty Interest*

Plaintiffs' due process claims may also be construed as raising a liberty interest, i.e., their right to engage in a particular business calling. A similar argument was addressed in *Blackburn*. The Fifth Circuit distinguished "egregious government conduct" which interfered with a person's right to engage in a private profession from a regulation which merely precludes a person from receiving referral business from the government. While the former situation results in the deprivation of a liberty interest, the latter does not. The tradition that a person may engage in the occupation of his choice "does not embrace any assumption of a right to particular government business or referrals." 42 F.3d, at 941.

The ordinance does not prohibit the plaintiffs from engaging in the business of vehicle storage. The ordinance does not restrict

their right to store preference tows or to store vehicles for other public agencies. For example, plaintiff James Rials stores "no preference" and impound vehicles for the City of Greenwood Police Department, and is presently the only company that does so. Other local potential sources of business include the Louisiana State Police and the Caddo Parish Sheriff's Department.

Plaintiffs respond that there is little or no market for preference storage, and that without referral business from the City of Shreveport, they may not be able to survive economically in the storage business. Unfortunately, the evidence does indicate that at least one or two of the plaintiff storage companies will suffer significant economic hardship as a result of the loss of the City's business. Yet a law or ordinance does not violate the Constitution solely because it directly or indirectly results in economic hardship to some sector of the private market. Were that the case, few regulatory statutes could pass constitutional muster. In this case, even if some of the plaintiffs suffer adverse economic effects as a result of the change to central storage, they have not established that they were deprived of a protected liberty interest under the Fourteenth Amendment.

Louisiana courts use essentially the same inquiry for the determining whether there is a vested property or liberty interest under Art. 1, § 2 of the Louisiana Constitution as is used under Fourteenth Amendment. See, e.g., Delta Bank & Trust Co. v. Lassiter, 383 So.2d 330, 334 (La.1980); Parker v. French Market Corp., 615 So.2d 1347, 1351 (La.App. 1993). For the same reasons stated with respect to the federal due process claims, plaintiffs' procedural due process claims under the Louisiana Constitution are without merit.[2]

*(2) Substantive Due Process*

■ Plaintiffs also challenge the central storage provision on substantive due process

grounds. Since the ordinance does not impact upon a fundamental right, plaintiffs face a heavy burden on this issue. Almost forty years ago, the United States Supreme Court observed that "[t]he day is gone when this Court uses the Due. Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought." *Williamson v. Lee Optical of Oklahoma,* 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955). "It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Id.* Put another way, the substantive due process inquiry is whether the challenged ordinance is rationally related to a legitimate state interest. *Nebbia v. People of the State of New York,* 291 U.S. 502, 525, 54 S.Ct. 505, 510, 78 L.Ed. 940 (1934); *Koch v. Yunich,* 533 F.2d 80, 84 (2nd Cir.1976). The question, then, is whether the challenged provisions of the ordinance survive scrutiny under this deferential standard.

■ The towing of vehicles from public highways obviously involves safety concerns for the public at large, and has traditionally been the subject of local government regulation. "Clearly, regulation of the removal from public thoroughfares of disabled vehicles and the cleaning up of accidents is the proper concern of government, i.e., the proper subject of police power, as it tends to promote the public safety." *City of Indianapolis v. Clint's Wrecker Service, Inc.,* 440 N.E.2d 737 (1982). *See also City of Chattanooga v. Fanburg,* 265 S.W.2d 15 (Tenn. 1954); *People v. LaFrantz,* 188 Misc. 989, 69 N.Y.S.2d 614 (1947); *City of Dallas v. Harris,* 157 S.W.2d 710 (1941).

■ In Shreveport, a city of comprised of 114 square miles and with a population of

**2.** Having concluded that plaintiffs have not been deprived of a protected property or liberty interest, the court has no occasion to consider what procedural protections would have been required in the event that such an interest was present. However, it should be noted that no plaintiff contends that it was deprived of an opportunity

to bid for the central storage facility, and everyone agrees that a public hearing on the proposed 1994 amendments was held before the city council in October, 1994. A number of the plaintiffs attended the hearing and objected to the proposed central storage facility, while others present argued in favor of the proposed change.

approximately 250,000 persons, the need for towing regulation is evident. At the hearing, it was established that there are approximately nine hundred to one thousand vehicle accidents per month, with perhaps four hundred of those requiring resort to the "no preference" rotational list. There are presently thirteen tow companies on the list, and each normally receives at least one "no preference" or impound call per day. Accordingly, the towing and storage of such vehicles is hardly a matter of minor importance. One can imagine the potential problems that might ensue if the towing and storage of some 400 "no preference" vehicles per month were not subject to any regulation whatsoever.

The City's determination that all "no preference" and impound vehicles should be stored in one location within the City limits was based on several reasonable concerns, including (1) providing a storage facility with adequate security and access; (2) facilitating owners and SPD in efforts to locate such vehicles; (3) eliminating the problem of storage at distant locations outside of the city limits; and (4) facilitating SPD inspection of impounded vehicles.

Plaintiffs argue that the City could have served at least some of these interests through different means, such as simply providing that any storage facility for "no preference" and impound vehicles must be located within the City limits. It is not the function of the court, however, to weigh the various options that the City could have pursued and determine which was best. The constitutional inquiry is whether the City's exercise of its police power was rationally related to legitimate interests. Because that inquiry results in an affirmative response, no further consideration of the wisdom of the City's policy choice is required. Plaintiffs have not established a substantive due process violation.

(3) *"Taking" Without Just Compensation*

Plaintiffs also contend that the creation of a central storage facility results in an unconstitutional "taking" of private property without just compensation in violation of the Fifth Amendment of the United States Constitution and Art. 1, § 4 of the Louisiana

Constitution. They rely a number of decisions for the proposition that "loss of business income is a 'taking.'" These cases actually stand for a different proposition, which is that *when a taking occurs,* loss of business income is a recoverable element of damages. *See, e.g., State v. Dietrich,* 555 So.2d 1355 (La.1990). In this case, the more pertinent question is whether a "taking" of plaintiffs' property occurred by virtue of the fact that the City awarded a central storage contract to Twin City.

■ The most obvious and common example of a public taking is the outright expropriation or appropriation of property by the governing authority. It is true that a *de facto* taking may also occur for the purposes of the subject constitutional provisions when a government regulation, such as a zoning ordinance, effectively deprives the plaintiff of the use of his property. *Layne v. City of Mandeville,* 633 So.2d 608, 610 (La.App. 1st Cir.1993). This case does not involve such a taking. Given that the plaintiffs have no vested property right to store "no preference" and impound vehicles on referral from the City, it follows that the loss of that particular aspect of their business is not a taking for which they are entitled to an award of just compensation. Nor is it accurate to conclude that plaintiffs have been deprived of the use of their property, since the ordinance does not prohibit them from engaging in the storage business.

(4) *Louisiana Antitrust Laws*

■ Plaintiffs argue that the ordinance and the City's contract with Twin City create an illegal combination in restraint of trade or commerce in violation of La.R.S. 51:122, and an illegal monopoly of trade in violation of R.S. 51:123. Municipalities do not have a *per se* exemption from these state law antitrust provisions. *Reppond v. City of Denham Springs,* 572 So.2d 224, 227–29 (La.App. 1st Cir.1990). Adopting the "state action rule" used by federal courts in defining the applicability of the Sherman Act, *Reppond* held that "immunity from the state anti-monopoly statutes will only extend to local government activities performed pursuant to a state policy to displace competition with regulation or

monopolistic service." *Id.*, at 229. Because there is no state policy providing for monopolistic service for the storage of towed vehicles, the City is not exempt from the application of Louisiana's antitrust laws in this case.

 The number of reported decisions interpreting Louisiana's antitrust statutes is relatively limited compared to federal antitrust jurisprudence. In determining whether the conduct at issue violates the state antitrust laws, the Court will rely in part on legal standards developed under federal jurisprudence. Louisiana's antitrust statutes closely resemble the provisions of the Sherman Act, 15 U.S.C. § 1, et al, and "the concerns which spurred the enactment of the federal Sherman Antitrust Act are the same as those which influenced Louisiana's adoption of virtually identical legislation." *Reppond,* 572 So.2d, at 228. Federal jurisprudence interpreting the Sherman Act may be used as persuasive interpretation of the state statute. *Louisiana Power & Light v. United Gas Pipe Line,* 493 So.2d 1149 (La.1986).

### (a) *Unreasonable Restraint of Trade*

 § 1 of the Sherman Act was intended to prohibit only unreasonable restraints of trade. *Business Electronics v. Sharp Electronics,* 485 U.S. 717, 723, 108 S.Ct. 1515, 1519, 99 L.Ed.2d 808 (1988). Thus, the issue of whether concerted action violates § 1 of the Sherman Act ordinarily is determined "through case-by-case application of the so-called rule of reason—that is, 'the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.'" *Id., citing Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). The cases in which the rule of reason is not applied are those in which the conduct in question is so manifestly anticom-

petitive that it constitutes a *per se* violation of the Act. *Business Electronics,* 485 U.S., at 723, 108 S.Ct., at 1519. These rules should be applied to the inquiry of whether there has been a violation of R.S. 51:122, the state law corollary to § 1 of the Sherman Act.[3]

Plaintiffs offer no authority for the proposition that the City's decision to award an exclusive storage contract to a private company could constitute a *per se* violation of § 1 of the Sherman Act or its state law corollary, R.S. 51:122. Given the wide range of public responsibilities faced by municipal governments, and the traditional discretion afforded such governments in the exercise of their police powers, it seems likely that most challenged municipal regulations should be scrutinized under the rule of reason, rather than struck down as *per se* illegal without inquiry into the public interest involved. In any event, there is no colorable argument for finding a *per se* violation in this case.

In applying the rule of reason, the inquiry in a case involving a private defendant is whether "the anticompetitive consequences" of the challenged action "outweigh their legitimate business justifications." *Clamp–All Corp. v. Cast Iron Soil Pipe Institute,* 851 F.2d 478 (1st Cir.1988). Since this case involves a defendant that is a municipality purporting to act for the public interest, the rule of reason inquiry is whether any anticompetitive consequences outweigh public benefits.

In this context, "anticompetitive" is a term of art that refers "not to actions that merely injure individual competitors, but rather to actions that harm the competitive process." *Clamp–All Corp,* 851 F.2d, at 486. "[T]he rule of reason requires plaintiffs to show that the defendants' actions amounted to a conspiracy against the market—a concerted at-

---

**3.** Plaintiffs argue that there is no Louisiana statute which codifies the rule of reason. The court observes that neither is there a federal statute which codifies this rule. Read literally, both the Sherman Act and the state statutes prohibit *every* combination in restraint of trade. However, the recognized purpose of antitrust laws is to prohibit only unreasonable and harmful anticompetitive practices. The notion that Louisiana antitrust law should be totally divorced from any type of

reasonableness inquiry is untenable. In the words of Chief Justice White, the absence of a reasonableness limitation could require the conclusion that the Sherman Act forbids virtually "every conceivable contract or combination ... anywhere in the whole field of human activity." *Standard Oil Co. of New Jersey v. United States,* 221 U.S. 1, 60, 31 S.Ct. 502, 516, 55 L.Ed. 619 (1911). The court is unwilling to attribute such an intention to the Louisiana Legislature.

tempt to ... reduce *consumer welfare.*" *Consolidated Metal Products v. American Petroleum Institute,* 846 F.2d 284, 293 (5th Cir.1988) (emphasis added). "Accordingly, a showing that the defendants harmed the plaintiffs is not enough to prove a violation of section 1 under the rule of reason." *Id.*

In this case, plaintiffs fail to establish an anticompetitive practice within the meaning of antitrust law. The only types of towing and storage transactions at issue in this case are those in which the vehicle owner, for whatever reason, is unable or unwilling to participate in the decision of where his vehicle will be stored. Both before and after the amendment to the ordinance, the consumer simply did not participate in the storage decision. Thus, it is not possible to conclude that the change to a central storage facility, even if injurious to the business interests of some of the plaintiffs, reduced consumer welfare or bargaining power. Any instance where the consumer is involved in the decision of where his vehicle is to be stored is beyond the purview of this case (and there is of course no city ordinance which prohibits an owner from storing his vehicle at the location of his choice).

The absence of an anticompetitive injury to the market is enough to terminate the antitrust injury. Even assuming that an anticompetitive practice were present, however, its consequences are outweighed by the legitimate public interests served by a central storage facility, as discussed above in connection with the substantive due process issue.

In summary, rule of reason analysis leads to the conclusion that the City's contract with Twin City and its use of a central storage facility is not an unreasonable restraint of trade or commerce.

#### (b) *Monopolization*

La.R.S. 51:123 prohibits monopolization of trade or commerce through language which tracks § 2 of the Sherman Act. This provision also requires a showing that "the defendant's acts, otherwise lawful, were *unreasonably* restrictive of competition." *California Computer Products, Inc. v. International Business Machines,* 613 F.2d 727, 736 (9th Cir.1979) (emphasis by the court). *See also*

*Appalachian Coals, Inc. v. United States,* 288 U.S. 344, 360, 53 S.Ct. 471, 77 L.Ed. 825 (1933). For the same reasons stated with respect to R.S. 51:122, the plaintiffs have failed to establish a violation of this statute.

#### (5) *Louisiana Unfair Trade Practices Act*

La.R.S. 51:1405 prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce...." Plaintiffs have cited no authority for the proposition that the City's grant of an exclusive storage contract to Twin City could trigger liability on the part of either defendant under R.S. 51:1405. Because the plaintiffs and the City are not business competitors, plaintiffs have no cause of action against the City under this statute. *Delta Truck & Tractor, Inc. v. J.I. Case Co.,* 975 F.2d 1192 (5th Cir.1992). While those plaintiffs who have storage facilities are competitors of Twin City, the statute only prohibits those practices which offend public policy and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to the consumer. *Bryant v. Sears Consumer Financial Corp.,* 617 So.2d 1191 (La.App. 3rd Cir.), *writ denied,* 619 So.2d 533 (1993). Twin City simply submitted a bid to the City for the central storage facility, as did plaintiff Shreveport Storage. The absence of any showing that the central storage arrangement is injurious to consumers has previously been discussed. There is no evidence that Twin City otherwise engaged in conduct violative of the statute.

#### (6) *Vagueness and Overbreadth*

In their petition, plaintiffs asserted that the ordinance is constitutionally defective on vagueness or overbreadth grounds because, as written, it prohibits a vehicle owner who has no preference as to a towing company from specifying the location where his vehicle is to be towed. There is no wording in the ordinance which supports the proposition that the owner of a "no preference" vehicle is ever restricted from designating the location where his vehicle is to be stored. To the contrary, § 102–220(X) defines "tow" as the act of a tow truck of moving a vehicle "to a location specified by the owner ... or to a location directed by the

Shreveport Police Department." Sgt. Salley testified at the hearing that the ordinance has never been applied in the manner argued by plaintiffs. Finally, plaintiffs did not seriously pursue this argument at the evidentiary hearing.[4] Plaintiffs have not established a colorable vagueness or overbreadth claim.

### (7) *State Preemption*

The Louisiana Towing and Storage Act ("LTSA"), R.S. 32:1711, *et seq.*, regulates "those who conduct towage and storage businesses in Louisiana, in order to prevent frauds, impositions, and other abuses upon its citizens, and to provide maximum safety for all persons who travel or otherwise use the public highways of this state." *Id.*, § 1711. The LTSA provides that no person shall engage in the towing business without a state license, establishes the criteria for obtaining such a license, provides certain procedures for storage and disposal of towed vehicles and authorizes the DPSC, through the state police, to adopt rules and regulations governing towing and storage applicable to all areas of the state except municipalities which have a population of 450,000 or more (*i.e.*, New Orleans). A copy of the state police regulations adopted pursuant to the LTSA has been submitted into the record. As discussed in connection with the procedural due process claim, the statutes and DPSC regulations which pertain to vehicle storage provide generally for law enforcement and owner notification regarding the storage of towed vehicles, and for procedures regarding the disposition of unclaimed vehicles.

The towing industry is also regulated by the Louisiana Public Service Commission ("LPSC") pursuant to R.S. 45:180.1. The express purpose of this provision is to protect the public from excessive towing charges. *Id.*, § 180.1(B), and LPSC is granted authority to "fix reasonable and just rates" for towing services. Municipalities are authorized to regulate towing "in the manner provided under this section until such time as the public service commission shall pass uni-

form regulations throughout the state." *Id.*, § 180.1(F).

Based on the foregoing statutes and the resulting regulation of the towing industry by both the DPSC and the LPSC, plaintiffs argue that state law preemption prohibits the City from regulating towing. The defendants respond that the City's towing ordinance does not conflict with any state statute or agency regulation, and that, through the powers reserved under its home rule charter, the City may regulate towing in any manner not inconsistent with state law.

The plaintiffs have not argued that any provision of the City ordinance, including the provision for central storage, conflicts with state law. There is no contention that the City has infringed upon the rate making authority of the LPSC, and there are no provisions in the ordinance which appear in conflict with state police regulations. Accordingly, the legal issue is whether despite the absence of a conflict between state and local law, state regulation is so pervasive as to wholly preclude municipal regulation of towing (*i.e.*, "field preemption").

In *City of New Orleans v. Board of Comm'rs*, 640 So.2d 237, 252 (La.1994), the Louisiana Supreme Court concluded that the state's constitution "strikes a balance in favor of home rule," and that:

[A] litigant claiming that a home rule municipality's local law abridges the police power of the state must show that the local law conflicts with an act of the state legislature that is necessary to protect the vital interests of the state as a whole. To establish that the conflict actually exists, the litigant must show that the state statute and the ordinance are incompatible and cannot be effectuated in harmony. Furthermore, to determine that the state statute is "necessary" it must be shown that the protection of such state interest cannot be achieved through alternative means less detrimental to home rule powers and rights.

---

4. In connection with their First Amendment claims, plaintiffs make other arguments that the statute is being applied in a manner that is constitutionally overbroad. Those arguments are addressed below in the portion of the report and recommendation which considers plaintiffs' First Amendment claims.

The striking aspect of the noted passage is that under Louisiana law, a municipal ordinance is not necessarily preempted even when it conflicts with state law. Preemption only occurs when the conflict is irreconcilable and involves a vital state interest that cannot be protected through alternative means. Apparently, at least with respect to municipalities operating under the authority of a home rule charter, Louisiana law does not countenance the doctrine of "field preemption." Because there is no conflict in this case between the municipal ordinance and the state statutes and regulations, much less an irreconcilable one, plaintiffs' state law preemption argument is unpersuasive.[5]

### (8) *Federal Preemption*

Plaintiffs alternatively argue that certain provisions of federal law wholly preclude local regulation of towing. If this argument is correct, then presumably all of the state statutes and regulations discussed above are also preempted by federal law. The issue, then, is whether Congress has enacted any law which voids all state and municipal statutes and regulations which regulate the towing industry. This court is unable to so conclude.

"State law is displaced by federal law where (1) Congress expressly preempts state law; (2) Congressional intent to preempt is inferred from the existence of a pervasive regulatory scheme; or (3) state law conflicts with federal law or interferes with the achievement of federal objectives." *Hodges v. Delta Airlines, Inc.,* 44 F.3d 334, 335 (5th Cir.1995). There is no serious contention that this case involves either of the latter two forms of federal preemption. There is no comprehensive federal regulatory scheme that pertains to vehicle towing, and the city ordinance does not conflict with any federal law or policy.

Plaintiffs allege, however, that express preemption is accomplished by a recent amendment to 49 U.S.C. § 11501, effective January 1, 1995, which provides in pertinent part that:

> a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision ... related to a price, route or service of any motor carrier ... with respect to the transportation of property. *Id.* § 11501(e).

§ 11501 sets forth the authority of the Interstate Commerce Commission ("ICC") over intrastate transportation. Read in isolation, the amendment appears to accomplish the preemption result advocated by plaintiffs. However, this provision should be read *in pari materia* with the provisions of 49 U.S.C. §§ 10521–10530, which define the ICC's jurisdiction over motor carrier transportation. In particular, § 10526(b) exempts from ICC jurisdiction "transportation provided entirely in a municipality" and "the emergency towing of an accidentally wrecked or disabled vehicle." "[O]n their faces, these subsections of the statute indicate Congress's intent not to preempt local towing services." *Interstate Towing v. City of Cincinnati, Ohio,* 6 F.3d 1154, 1158 n. 4 (6th Cir.1993). It is neither likely nor logical that Congress, in enacting § 11501(e), intended to preempt local regulation of areas otherwise excluded from the ICC's jurisdiction. To do so would leave the towing industry unlike any other portion of the transportation industry, free from any regulation by federal, state or local government.

Plaintiffs also rely on the legislative history of the recent amendment, and point to a one lawmaker's effort to add a provision specifically exempting towing and garbage collection. Cong.Rec. H1830 (daily ed. Sept. 12,

---

**5.** Plaintiff has provided the Court with a copy of an unreported district court decision from Civil District Court for the Parish of Orleans, *Rudy Smith Service, Inc. v. City of New Orleans,* No. 90–13280, in which the district judge enjoined the enforcement of a New Orleans towing ordinance on a number of grounds, including state law preemption. The basis of the preemption holding was that licensing fees charged under the city ordinance were in excess of the licensing fees which may be charged by the LPSC under R.S. 45:180.1. This decision was issued in 1992, and apparently was not appealed. The present case does not involve a dispute over licensing fees. Also, the district court did not have the benefit of the state supreme court's 1994 decision in *City of New Orleans v. Board of Com'rs,* a ruling which conceivably could have impacted its preemption analysis.

1994) (statement of Rep. Rahall). In presenting a technical corrections bill for that purpose (after the passage of the recent amendment), Representative Rahall stated that:

> Again, in my view, the intent of section 601 [now codified as 49 U.S.C. § 11501(e) ] was to address issues relating to the transportation by motor carrier of general freight and express small packages. I do not believe there was any intent to affect motor carriers, such as tow truck drivers. *Id.*

While it is not clear whether Congress has acted on this proposal, its rejection of the same would not necessarily support the proposition that Congress intends for § 11501(e) to apply to local towing operations. Given the fact that emergency towing operations are already exempted by § 10526(b), the proposed technical corrections bill is arguably unnecessary, at least as it applies to towing. Furthermore, this lawmaker's remarks regarding the clearly understood purpose of the recent amendment are unhelpful to plaintiffs' position.

In summary, the court finds no basis for concluding that the City ordinance is preempted by federal law.

### (C) CLAIMS PERTAINING TO SOLICITATION OF BUSINESS

Plaintiffs' petition also includes a First Amendment challenge to § 102–340(A) of the city towing ordinance, which provides that:

> No person regulated under these rules shall stop at the scene of an accident or at or near an unattended or disabled vehicle for the purpose of soliciting an engagement for towing service, either directly or indirectly, nor furnish any towing service, unless that person has been summoned to such scene by the owner or operator of the disabled vehicle or has been requested to perform such services by a law enforcement officer or agency pursuant to that agency's authority.

This provision was contained in the original ordinance enacted in 1985, and was not altered by the 1994 amendments. Sgt. Salley testified that to his knowledge, no person has ever been prosecuted for violating the provi-

sion. Plaintiffs' petition appears to allege that a rule which prohibits a tow truck operator from stopping at the scene of a disabled vehicle and soliciting business, unless first summoned by the police or the vehicle operator, is a *per se* violation of the First Amendment. During oral argument at the conclusion of the evidentiary hearing, plaintiffs' counsel essentially abandoned that argument.

Nevertheless, to the extent that there is any ambiguity as to whether plaintiffs are continuing to pursue a First Amendment challenge to the express wording of § 102–340, the court will briefly address the merits of that issue. "[L]aws restricting commercial speech, unlike laws burdening other forms of protected expression, need only be tailored in a reasonable manner to serve a substantial state interest in order to survive First Amendment scrutiny." *Edenfield v. Fane*, 507 U.S. 761, ——, 113 S.Ct. 1792, 1794, 123 L.Ed.2d 543 (1993). The substantial public interests served by the prohibition of on site solicitation are public safety and the need for orderly handling of vehicular accidents. Specifically, the City seeks to prohibit a situation where multiple towing companies race to an accident scene and barter for business. This is a limited prohibition against solicitation which does not preclude towing companies from soliciting business in more appropriate forums. There is a similar state law provision (which plaintiffs have not challenged). R.S. 32:1714(2). In rejecting a First Amendment challenge to a similar no solicitation provision in *City of Indianapolis v. Clint's Wrecker Service, Inc.*, 440 N.E.2d 737, 742 (1982), the court held that the restriction was a "reasonable means of avoiding compounded congestion of the accident site, as well as the other hazards noted by the City which ... exist in the absence of regulation." The same considerations apply here, and there is no merit to the proposition that the prohibition of solicitation at an accident site violates the First Amendment.

Nevertheless, plaintiffs argue that this provision is being applied in a manner that is unconstitutional, because even when legitimately summoned to the accident scene

on a "no preference" call, tow truck operators have been prohibited from negotiating storage of the vehicle at any location other than Twin City's facility. Were this in fact the case, plaintiffs might well have a strong argument that the ordinance is being applied in a manner that violates the First Amendment. However, plaintiffs presented no evidence of any instance in which a tow truck driver was informed by police or other city officials at the scene of a "no preference" tow that he was prohibited from talking about a storage location with the vehicle operator. Instead, plaintiffs rely for proof of the alleged unconstitutional enforcement of the ordinance on the portion of the December 27, 1994 memorandum sent by City CAO Collins to all tow truck operators which stated that "[i]f you are called by the Shreveport Police Department on a 'no preference' call from the rotational list, you may not negotiate the storage of the vehicle at a place other than the place directed by the City of Shreveport."

A reasonable interpretation of the CAO's memorandum, read in its entirety, is that it was intended to emphasize to tow truck operators that compliance with terms of the amended ordinance was not "negotiable," i.e., optional, and that "no preference" vehicles had to be towed to the central storage facility unless the vehicle owner chose another location. There was evidence that this memorandum was written to assure compliance with the new ordinance during the month of January, 1995, since there was a "window" between the expiration of 1994 city tow truck permits on December 31, 1994, and the issuance of 1995 permits on February 1, 1995. Read in this manner, the memorandum does not prohibit a tow truck driver from advising the owner of a "no preference" vehicle of the option to store his vehicle elsewhere.

Plaintiffs' contrary interpretation of the meaning of the memorandum is not manifest-

ly unreasonable. However, given that there are at least two reasonable interpretations of what the memorandum means (its author did not testify at the hearing), and because there is no other evidence indicating that the ordinance is being applied in the manner alleged by plaintiffs, the evidence is insufficient to support the issuance of a preliminary injunction as to the First Amendment claim. The *possibility* that the ordinance may be interpreted and applied in a manner that violates the First Amendment does not translate into a finding that the plaintiffs have "a substantial likelihood of prevailing on the merits" of their First Amendment claim. *Allied Group, supra.*[6]

## (D) SUMMARY

With respect to each of their federal and state law challenges, the plaintiffs have failed to establish a substantial likelihood of success on the merits. For that reason, a preliminary injunction is not warranted.[7] While this conclusion makes it unnecessary to consider the three remaining requirements for the issuance of a preliminary injunction, the court observes that the public needs served by the challenged ordinance would also make it difficult for plaintiffs to satisfy the fourth requirement, which is that the issuance of an injunction would not undermine public interests.

Accordingly, and for the foregoing reasons, IT IS RECOMMENDED that plaintiffs' motion for a preliminary injunction be DENIED.

### Objections

Under the provisions of 28 U.S.C. section 636(B)(1)(C), and Fed.R.Civ.Proc. 72(b), the parties have ten (10) business days from receipt of this Report and Recommendation to file specific, written objections with the

6. For the same reason, the court is unpersuaded by plaintiffs' argument that the no solicitation provision is overbroad because it could be interpreted as preventing a private "good samaritan" from offering towing assistance to the operator of a disabled vehicle. As reasonably interpreted, the term "solicitation" refers to solicitation for hire, and not an act of charitable assistance.

7. The only matter before the court is plaintiffs' request for a preliminary injunction. While plaintiffs' claims for declaratory and permanent injunctive relief, if pursued, may involve much of the same evidence and identical legal issues, disposition of those claims will require additional proceedings.

Clerk. Timely objections will be considered by the district judge prior to a final ruling.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE, OR WITHIN THE TIME GRANTED PURSUANT TO FED.R.CIV.PROC. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS ON APPEAL EXCEPT UPON GROUNDS OF PLAIN ERROR OR MANIFEST INJUSTICE. SEE** *THOMAS V. ARN,* **474 U.S. 140, 106 S.CT. 466, 88 L.ED.2D 435 (1985);** *CARTER V. COLLINS,* **918 F.2D 1198, 1203 (5TH CIR.1990).**

THUS DONE AND SIGNED at Shreveport, Louisiana, on this the 10th day of March, 1995.