**HARRIS COUNTY WRECKER OWNERS FOR EQUAL OPPORTUNITY** and **Houston Private Wrecker Association,** Plaintiffs,

v.

**CITY OF HOUSTON, Defendant.**

Civil Action No. H–95–4802.

United States District Court,
S.D. Texas,
Houston Division.

Oct. 21, 1996.

Jonathan E. Bruce, Houston, TX, for plaintiffs.

Gene L. Locke, James Edwin Essig, Liddell Sapp Zivley Hill and Laboon, Houston, TX, for defendant.

### MEMORANDUM AND ORDER

LAKE, District Judge.

Plaintiffs, Harris County Wrecker Owners for Equal Opportunity (HCW) and Houston Private Wrecker Association (HPWA), are associations whose members tow vehicles in the City of Houston. Because their members do not possess emergency wrecker permits (E–Tags), they are restricted under the Houston Wrecker Ordinance from engaging in non-consensual towing from the scene of an accident or arrest. In this action plaintiffs contend that parts of the ordinance are invalid because they are preempted by federal law.

Pending before the court are HCW and HPWA's Motion for Summary Judgment (Docket Entry No. 9), Supplemental Motion for Summary Judgment (Docket Entry No. 25), Motion for Leave to Amend Complaint and Add Additional Plaintiffs (Docket Entry No. 38), and Motion for Permanent Injunction (Docket Entry No. 39), the City of Houston's Motion for Summary Judgment (Docket Entry No. 15) and First Amended Motion for Summary Judgment (Docket Entry No. 22), and Johnny L. Waltmon's Motion to Dismiss Houston Private Wrecker Association as Plaintiff (Docket Entry No. 27).

## I. *Factual and Procedural Background*

The City of Houston has regulated tow truck operators for many years.[1] The current wrecker ordinance is codified as Article III, Chapter 8, Code of Ordinances of the City of Houston.[2] The wrecker ordinance regulates licensing, pricing, areas of operation, minimum levels of financial responsibility, storage facilities, and minimum equipment requirements.[3]

The wrecker ordinance establishes four categories of wrecker permits: transfer wrecker permits (T–Tags),[4] private wrecker permits (P–Tags),[5] emergency wrecker permits (E–Tags),[6] and heavy-duty wrecker permits.[7] T–Tags, P–Tags, and heavy-duty wrecker permits are issued as a matter of course upon the submission of a verified application, an application fee, and proof of financial responsibility.[8] The approval of E–Tags, however, is limited "to service public need and convenience."[9] E–Tag applications are only accepted once every two years, in July of odd-numbered calendar years.[10] An applicant must demonstrate to the City Director of Finance and Administration that a public need and convenience exists for an additional E–Tag in the requested service area.[11] If an applicant makes an initial showing of public need, the applicant must appear at a hearing and present "clear, co-

---

1. City of Houston Ordinance No. 57–849 (July 1957), Exhibit B to Appendix in Support of the City's Motion for Summary Judgment, Docket Entry No. 17. *See Brumfield Towing Serv., Inc. v. City of Baton Rouge*, 911 F.Supp. 212, 215 (M.D.La.1996).

2. City of Houston, Code of Ordinances, art. III, ch. 8, Exhibit A to Appendix to the City's Motion for Summary Judgment.

3. Code of Ordinances, art. III, ch. 8.

4. Code of Ordinances, art. III, ch. 8, §§ 8–124 through 8–130. The T–Tag authorizes the transportation of motor vehicles with the motor vehicle owner's permission (a "consensual" tow). Code of Ordinances § 8–115(b).

5. Code of Ordinances §§ 8–132 through 8–133. The P–Tag authorizes consensual towing and non-consensual towing from private property. Code of Ordinances § 8–115(b), (c). A P–Tag holder in a designated service area may also respond to a police officer's request to tow any motor vehicle from the scene of an accident or an arrest provided that no emergency wrecker authorized to operate as an emergency wrecker in the service area is available. Code of Ordinances § 8–115(d)(3).

6. Code of Ordinances §§ 8–135 through 8–142. The E–Tag authorizes consensual towing, non-consensual towing from private property, and non-consensual emergency towing of disabled vehicles and vehicles impounded by the police department from the public streets. Code of Ordinances § 8–115(b)—(d). In an emergency tow-

ing situation the vehicle owner may also request any wrecker to come to the scene to tow his vehicle. Code of Ordinances § 8–115(d)(1).

7. Code of Ordinances § 8–131. The heavy-duty wrecker permit authorizes consensual towing and non-consensual towing from private property. Code of Ordinances § 8–115(b), (c).

8. Code of Ordinances §§ 8–125, 8–131, 8–133.

9. Code of Ordinances § 8–135(a), (b).

10. Code of Ordinances § 8–135(a).

11. Code of Ordinances § 8–135(a), (b). The factors considered by the director in evaluating the public need and convenience for the issuance of an E–Tag include: (1) the time police officers must wait for emergency wreckers to respond to a police dispatch; (2) the need for additional emergency wreckers to remove vehicles from the scenes of accidents and arrests; (3) the effect of additional emergency wreckers on traffic congestion; and (4) any other factors the director finds relevant. Code of Ordinances § 8–135. In the past other relevant factors have included changing traffic patterns, increased efforts at crime prevention leading to more arrests, the monopoly characteristics of the E–Tag industry, market price inequalities in the value of an E–Tag, and diversity in demographics. See City of Houston Finance and Administration Department Report on 1991 Emergency Wrecker Permits at pp. 7–11, Exhibit 1 to HCW and HPWA's Response to Amicus Curiae Brief, Docket Entry No. 37.

gent and convincing evidence" that he or she is qualified for an E–Tag.[12] The director will then determine which, if any, of the E–Tags requested should be granted.[13] Over the years competition among tow truck operators for the issuance of an E–Tag has been intense.[14] In 1991, for example, 115 applicants requested 297 E–Tag permits, but only sixteen permits were issued.[15] In the previous four years (1987–1990) a total of fifteen permits were issued.[16]

All wrecker permits for non-consensual towing (P–Tags and E–Tags) are restricted to one of five established service areas in the city.[17] The wrecker ordinance sets the price of non-consensual towing at $57.00 for all tows not requiring a heavy-duty wrecker.[18] If a tow requires a heavy-duty wrecker the fee is limited to $50 per hour with a minimum charge of two hours.[19] A tower found in violation of any provision of the wrecker ordinance is guilty of a misdemeanor and subject to a fine of not less than $200 nor more than $500.[20]

On January 1, 1995, section 601(c) of the Federal Aviation Administration Authorization Act (the FAAA Act) of 1994 became effective and was codified as part of the Interstate Commerce Act (the Act). The Act provided in part:

(1) General Rule.—Except as provided in paragraph[] (2) . . . a State, [or] political subdivision of a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . or any motor private carrier . . . with respect to the transportation of property.

(2) Matters not covered.—Paragraph (1)—

(A) shall not restrict the safety regulatory authority of a State with respect to motor vehicles, the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous nature of the cargo, or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization. . . .

49 U.S.C. § 14501(c)(1) and (2)(A) and (B) (1996).

**12.** Code of Ordinances § 8–137.

**13.** Code of Ordinances § 8–139. Factors considered by the director include: (1) the moral character and criminal history of the applicant; (2) the capability of the applicant to provide emergency towing in the service area(s) requested; (3) the ability of the applicant to provide reliable service as demonstrated by past activities; (4) the capability of the applicant to provide emergency service at all hours and during adverse weather conditions; (5) the effect of special qualifications of the applicant to serve the needs of the public in the area for which the permit is sought, including the fact the applicant is a minority business enterprise and the location of the applicant's business; (6) past utilization of any E–Tags currently held by the applicant; (7) the ability of the applicant to finance the purchase of a tow truck and to sustain operation of the emergency towing service; (8) payment of ad valorem and other taxes; and (9) any other factor the director finds relevant in determining whether the public would be best served by the issuance of the permit requested by the applicant as compared to the issuance of permits requested by other applicants. Code of Ordinances § 8–137(c). "Other relevant factors" considered by the director in 1991 included promoting economic and community development, discouraging growth of monopolies, encouraging new entrants in the industry, and discouraging the acquisition and selling of permits primarily for monetary gain. See City of Houston Finance and Administration Department Report on 1991 Emergency Wrecker Permits at pp. 15–16.

**14.** Finance and Administration Department Report on 1991 Emergency Wrecker Permits.

**15.** Finance and Administration Department Report on 1991 Emergency Wrecker Permits at pp. 1, 18.

**16.** Finance and Administration Department Report on 1991 Emergency Wrecker Permits at p. 5.

**17.** Code of Ordinances §§ 8–132, 8–135. A P–Tag applicant may request multiple service areas for a single permit if the applicant provides the name and location of at least one private storage lot and police private storage lot in each service area in which the applicant operates or with which the applicant has an agreement to deliver motor vehicles. Code of Ordinances § 8–132.

**18.** Code of Ordinances § 8–214(a).

**19.** Code of Ordinances § 8–214(b).

**20.** Code of Ordinances § 8–103.

On October 11, 1995, plaintiffs filed this action alleging that certain provisions of the Houston wrecker ordinance are preempted by the Act. Plaintiffs requested a declaration that those provisions are illegal, an order enjoining their enforcement, and compensatory damages for the loss of business opportunity and loss of profits suffered by plaintiffs because of the continued enforcement of the challenged provisions of the wrecker ordinance.

On November 29, 1995, pursuant to an expedited briefing schedule on the issue of preemption, plaintiffs filed a motion for summary judgment requesting the court to declare Code of Ordinances §§ 8–102, 8–115(c) & (d), 8–135, 8–136, and 8–214 preempted by the Act and to enjoin their enforcement (Docket Entry No. 9). The city filed a cross-motion for summary judgment on December 29, 1995, arguing that the Act did not preempt the wrecker ordinance provisions or, alternatively, that certain of those provisions are excepted from preemption as safety regulatory measures (Docket Entry No. 15).

While these motions were pending, Congress passed the Interstate Commerce Commission (ICC) Termination Act of 1995, effective January 1, 1996. Pub.L. No. 104–88, 109 Stat. 803 (1995). As part of the termination of the ICC Congress recodified former 49 U.S.C. § 11501(h) as 49 U.S.C. § 14501(c) and amended the statute to include a new exception to preemption:

> (2) Matters not covered.—Paragraph (1)—
>
> * * * * * *
>
> (C) does not apply to the authority of a State or a political subdivision of a State to enact or enforce a law, regulation, or other provision relating to the price of for-hire motor vehicle transportation by a tow truck, if such transportation is performed without the prior consent or

authorization of the owner or operator of the motor vehicle.

49 U.S.C. § 14501(c)(2)(C).

On February 8, 1996, the court granted the parties leave to amend or supplement their pleadings, motions, and briefs, to allow them to address the import of this new law. In response plaintiffs filed their First Amended Complaint on February 21, 1996,[21] and Supplemental Motion for Summary Judgment on March 15, 1996, arguing that newly-added § 14501(c)(2)(C) evidenced Congress's intent to preempt state and local intrastate towing regulations. Specifically, plaintiffs' supplemental motion for summary judgment requests the court to declare Code of Ordinances §§ 8–102, 8–115(c) & (d), and 8–135 through 8–142 preempted by the Act and to enjoin their enforcement. The city filed its First Amended Motion for Summary Judgment (Docket Entry No. 22) arguing that § 14501(c) does not preempt local towing regulations, that the challenged ordinances fall within the statutory exception from preemption or, alternatively, that the statute violates the Commerce Clause.

While the court was considering these motions, Johnny L. Waltmon, a non-party to this lawsuit, filed a Motion to Dismiss Houston Private Wrecker Association as Plaintiff (Docket Entry No. 27) on August 16, 1996. Waltmon argues that he organized and obtained the assumed name certificate for HPWA as a proprietorship and is the only person authorized to use that name or act on behalf of HPWA.[22]

Apparently roused into action by Waltmon's filing, the Houston Automobile Wrecker Association (HAWA), whose members include Houston-area towing companies holding E–Tags, P–Tags, and heavy-duty wrecker permits, filed a Motion for Leave to File Amicus Curiae Brief (Docket Entry No. 29) on August 21, 1996. The court granted the motion on September 6, 1996.

---

**21.** In their First Amended Complaint plaintiffs argue that additional wrecker ordinance provisions not previously listed in the original complaint are preempted. These include, "but are not limited to," Code of Ordinances §§ 8–137, 8–141, and 8–161 through 8–165 (relating to issuance of E–Tags and a city-created driver's license). Pursuant to the new statutory language

of § 14501(c)(2)(C), plaintiffs have removed § 8–214 (price regulation) from their list of challenged regulations.

**22.** Affidavit of Johnny L. Waltmon in Support of Motion to Dismiss, Exhibit 1 to Johnny L. Waltmon's Motion to Dismiss.

(Docket Entry No. 36). The Amicus Curiae Brief supports the challenged ordinances and also argues that HCW and HPWA have failed to show standing to sue on behalf of their individual members. Plaintiffs filed their Response to Amicus Curiae Brief (Docket Entry No. 37) on September 23, 1996. Plaintiffs also seek leave to amend the complaint and to add additional plaintiffs in order to cure any standing problems raised by Amicus Curiae.

## II. *Waltmon's Motion to Dismiss HPWA*

▉ Waltmon argues that he is the only person authorized to use the name HPWA or to act on its behalf. As proof, Waltmon attaches certified copies of a "Certificate of Ownership for Unincorporated Business or Profession" and a "Direct Index of Assumed Name Records," both filed with the County Clerk of Harris County, Texas, showing that Waltmon is the owner of HPWA.[23] Plaintiffs respond that the motion to dismiss should be denied and attorney's fees be awarded to plaintiffs because Waltmon has not been joined by any party or intervened in this suit and has filed the pending motion solely for purposes of delay and harassment. Because Waltmon has not been joined as a party to this action and has not properly intervened under Fed.R.Civ.P. 24 he has no standing to file any pleadings in this case. Accordingly, the motion to dismiss will be denied. However, because the court is not satisfied that Waltmon's motion was filed solely for purposes of delay and harassment the plaintiffs' request for attorney's fees will be denied.

## III. *Plaintiffs' Motion for Leave to Amend*

In response to the standing issues raised in the Amicus Curiae Brief, HCW and HPWA seek leave to amend the complaint to add their individual members as party plaintiffs, to plead each individual member's cause of action, to allege additional facts relating to the standing of HCW and HPWA, and to add a count for violation of 42 U.S.C. § 1983.[24]

A party may amend by leave of court, and leave shall be freely given when justice so requires. Fed.R.Civ.P. 15(a); *Patterson v. P.H.P Healthcare Corp.*, 90 F.3d 927, 934 (5th Cir.1996). Because the addition of the individual plaintiffs will not cause undue surprise, prejudice, or delay to the city, the court will grant leave to amend the complaint to add the individual members as party plaintiffs, to plead each individual member's damages, and to allege additional facts relating to the standing of HCW and HPWA. However, plaintiffs' motion for leave to amend the complaint to add a count for violation of 42 U.S.C. § 1983 will be denied without prejudice because plaintiffs have failed to articulate any protected liberty or property interest being violated by the city.

## IV. *Jurisdiction and Standing*

▉ To proceed with this action plaintiffs must establish that the court has jurisdiction and that plaintiffs have standing to bring the action. This court has jurisdiction under 28 U.S.C. § 1331. "A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 2899 n. 14, 77 L.Ed.2d 490 (1983).

▉ To establish individual standing a person must show that (1) he has suffered an actual or threatened injury as a result of the actions of the defendant, (2) the injury is "fairly traceable" to the defendant's actions, and (3) the injury will likely be redressed if he prevails in his lawsuit. *Metropolitan Washington Airports Authority v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 264–66, 111 S.Ct. 2298, 2306, 115 L.Ed.2d 236 (1991); *Johnson v. Hosp. Corp.*

---

23. Attachments to Affidavit of Johnny L. Waltmon in Support of Motion to Dismiss, Exhibit 1 to Johnny L. Waltmon's Motion to Dismiss.

24. See Plaintiffs' Motion for Leave to Amend Complaint and Add Additional Plaintiffs; Affida-

vit of Brian W. Schmalriede, Exhibit 1 to Plaintiffs' Motion for Leave to Amend; Affidavit of Johnny Johnson, Exhibit 2 to Plaintiffs' Motion for Leave to Amend.

*of Am.*, 95 F.3d 383, 389–90 (5th Cir.1996); *Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp.*, 95 F.3d 358, 360–61 (5th Cir. Sept. 3, 1996).

■ Associations such as HCW and HPWA may have standing as representative of their members even in the absence of injury to the associations themselves. *Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 280–82, 106 S.Ct. 2523, 2528, 91 L.Ed.2d 228 (1986); *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 342–44, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); *Nat'l Treasury Employees Union v. U.S. Dep't of Treasury*, 25 F.3d 237, 241 (5th Cir.1994). An association has standing to bring an action on behalf of its members if (1) the association members would have standing to sue individually, (2) the association is seeking to protect interests that are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the association members to participate in the lawsuit. *Hunt*, 432 U.S. at 342–44, 97 S.Ct. at 2441; *Friends of the Earth*, 95 F.3d 358, 360–61; *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.*, 73 F.3d 546, 555 (5th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 57, 136 L.Ed.2d 20 (1996). *See also United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*, —— U.S. ——, ——, 116 S.Ct. 1529, 1534, 134 L.Ed.2d 758 (1996).

■ The individual plaintiffs are suffering injury-in-fact because they are compelled to operate in restricted service areas and are prevented under threat of arrest or criminal fine from towing motor vehicles from the scene of an accident or arrest.[25] These injuries are fairly traceable to the city's continued enforcement of the wrecker ordinance. The individual plaintiffs also meet the redressability requirement because their injuries would be redressed by a favorable decision. Accordingly, the individual plaintiffs have standing to sue.

■ In order to have standing on behalf of their members HCW and HPWA "must show [an individual who] 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct, and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983). Because their individual members have been added as plaintiffs and have alleged a real and immediate economic injury as the result of the city's enforcement of the wrecker ordinance, HCW and HPWA have standing to seek declaratory and injunctive relief on behalf of their membership.[26]

### V. *Summary Judgment Standard*

Summary judgment should be granted if the record, taken as a whole, "together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment." Fed.R.Civ.P. 56(c); *New York Life Ins. Co. v. Travelers Ins. Co.*, 92 F.3d 336, 338 (5th Cir.1996); *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 758 (5th Cir.1996). The Supreme Court has interpreted the plain language of Rule 56(c) to mandate "the entry of

---

**25.** See Schmalriede Affidavit, Exhibit 1 to Plaintiffs' Motion for Leave to Amend Complaint to Add Additional Plaintiffs; Johnson Affidavit, Exhibit 2 to Plaintiffs' Motion for Leave to Amend.

**26.** In addition to declaratory and injunctive relief HCW and HPWA initially sought compensatory damages on behalf of their membership for the city's continued enforcement of the challenged wrecker ordinance provisions. A request for compensatory damages normally requires the participation of individual members in the lawsuit. As the Supreme Court held in *Warth v. Seldin*, 422 U.S. 490, 513–15, 95 S.Ct. 2197, 2213, 45 L.Ed.2d 343 (1975), an association may seek only prospective relief for its members un-

less the damage claims are common to the entire membership. 422 U.S. at 515–17, 95 S.Ct. at 2214. If "whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury ... require individualized proof," each member must be a party to the suit. *Warth*, 422 U.S. at 515–16, 95 S.Ct. at 2214. Although plaintiffs' First Amended Complaint and summary judgment evidence failed to allege that the damage claims were common to the entire membership, the addition of the individual plaintiffs under the Second Amended Complaint moots that concern. The individual plaintiffs may each seek to prove damages on his or her own behalf.

summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). *See also Gunaca v. Texas,* 65 F.3d 467, 469 (5th Cir.1995). A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not *negate* the elements of the nonmovant's case." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (*en banc*) (quoting *Celotex,* 477 U.S. at 323–25, 106 S.Ct. at 2553). If the moving party "fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." 37 F.3d at 1075.

If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. *Id.; Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1046–47 (5th Cir.1996). The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence. *Little,* 37 F.3d at 1075; *Wallace,* 80 F.3d at 1047. Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Wallace,* 80 F.3d at 1047. *Accord, S.W.S. Erectors, Inc. v. Infax, Inc.,* 72 F.3d 489, 494 (5th Cir.1996). The court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *McCallum Highlands v. Washington Capital Dus, Inc.,* 66 F.3d 89, 92 (5th Cir.), *as revised on denial of rehearing,* 70 F.3d 26 (5th Cir.1995). Unless there is sufficient evidence for a jury to return a verdict in the nonmovant's favor, there is no genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–51, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

██ When affidavits are used to support or oppose a motion for summary judgment they "shall be made on personal knowledge, shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e); *Beijing Metals & Minerals Import/Export Corp. v. American Business Ctr., Inc.,* 993 F.2d 1178, 1182 (5th Cir.1993). Affidavits that are not based on personal knowledge or that are based merely on information and belief do not satisfy the requirements of Rule 56(e), and those portions of an affidavit that do not comply with Rule 56(e) are not entitled to any weight and cannot be considered in deciding a motion for summary judgment. *Richardson v. Oldham,* 12 F.3d 1373, 1378–79 (5th Cir.1994). Neither shall conclusory affidavits suffice to create or negate a genuine issue of fact. *McCallum Highlands v. Washington Capital Dus,* 66 F.3d at 92; *Travelers Ins. Co. v. Liljeberg Enterprises, Inc.,* 7 F.3d 1203, 1207 (5th Cir.1993); *Salas v. Carpenter,* 980 F.2d 299, 305 (5th Cir. 1992).

## VI. *Preemption*

Plaintiffs argue that 49 U.S.C. § 14501(c) preempts state and local intrastate towing regulations related to a price, route, or service. Specifically, plaintiffs ask the court to declare the city's Code of Ordinances §§ 8–102, 8–115(c) & (d), and 8–135 through 8–142 preempted by the Act and to enjoin their enforcement. The city responds that the Act does not preempt local towing regulations or, alternatively, that the challenged ordinances fall within statutory exceptions from preemption.

██ Under the Supremacy Clause, ". . . the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. State laws that "interfere with, or are contrary to the laws of congress, made in pursuance of the constitution" are invalid. *Gibbons v. Ogden,* 9 Wheat. 1, 211, 6 L.Ed. 23 (1824) (Marshall, C.J.). "The ways in which federal law may pre-empt state law are well established and

in the first instance turn on congressional intent." *Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 603–05, 111 S.Ct. 2476, 2481, 115 L.Ed.2d 532 (1991). "State law is displaced by federal law where (1) Congress expressly preempts state law, (2) Congressional intent to preempt is inferred from the existence of a pervasive regulatory scheme, or (3) state law conflicts with federal law or interferes with the achievement of federal objectives." *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 335 n. 1 (5th Cir.1995) (*en banc*) (citations omitted). *See also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383, 112 S.Ct. 2031, 2036, 119 L.Ed.2d 157 (1992) ("[P]reemption may be either express or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose."). "When considering pre-emption, 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. at 605, 111 S.Ct. at 2482 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 229–31, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). "'[F]or the purposes of the Supremacy Clause, the constitutionality of local ordinances is analyzed in the same way as that of statewide laws.'" *Id.* (quoting *Hillsborough County v. Automated Medical Lab., Inc.*, 471 U.S. 707, 712–14, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985)). *See also Texas Manufactured Housing Ass'n v. City of Nederland*, 905 F.Supp. 371, 376 (E.D.Tex.1995) ("The lines of inquiry are identical whether it be either state statute or local ordinance which is being scrutinized against the preemptive force of federal law.").

■ The parties do not contend that this case involves the second or third form of federal preemption. There is no comprehensive federal regulatory scheme that pertains to vehicle towing, and the city wrecker ordi-

nance does not conflict with any federal law or policy. *See Giddens v. City of Shreveport*, 901 F.Supp. 1170, 1183 (W.D.La.1995). The question, therefore, is whether Congress expressly preempted state and local regulation of intrastate tow trucking and, if so, whether the challenged provisions of the Houston wrecker ordinance fall within the preemptive ambit of federal law.

## A. Are state and local intrastate tow truck regulations preempted by § 14501(c)?

### 1. *The Federal Act*

■ "Express preemptive language may be found on the face of a statute, in its legislative history, or in regulations promulgated pursuant to the law." *Texas Manufactured Housing Ass'n v. City of Nederland*, 905 F.Supp. at 376 (citing *Howard v. Uniroyal, Inc.*, 719 F.2d 1552, 1556 (11th Cir.1983)). "The question, at bottom, is one of statutory intent, and we accordingly 'begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.'" *Morales v. Trans World Airlines*, 504 U.S. at 383, 112 S.Ct. at 2036 (quoting *FMC Corp. v. Holliday*, 498 U.S. 52, 56–58, 111 S.Ct. 403, 407, 112 L.Ed.2d 356 (1990)). "To discern Congress' intent we examine the explicit statutory language and the structure and purpose of the statute." *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 137–39, 111 S.Ct. 478, 482, 112 L.Ed.2d 474 (1990).[27]

To understand the scope of 49 U.S.C. § 14501(c) it must be read in the context of the Interstate Commerce Act, of which it is a part. "Unfortunately, the Interstate Commerce Act consists of a complex web of exceptions, exemptions and cross-references which must be parsed through both individually and collectively." *426 Bloomfield Ave.*

---

27. The court rejects plaintiffs' argument, made in their first motion for summary judgment, that the terms of § 14501(c) may be interpreted literally, and without reference to the entire statute. Brief in Support of Plaintiffs' Motion for Summary Judgment, at pp. 716–718. It is a "cardi-

nal rule that a statute is to be read as a whole, since the meaning of statutory language plain or not, depends on context." *King v. St. Vincent's Hosp.*, 502 U.S. 215, 220–22, 112 S.Ct. 570, 574, 116 L.Ed.2d 578 (1991).

*Corp. v. City of Newark,* 904 F.Supp. 364, 368 (D.N.J.1995).

Subsection 14501(c) states in relevant part:

(1) General Rule.—Except as provided in paragraphs (2) and (3), a State [or] political subdivision of a State ... may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier ... or any motor private carrier ... with respect to the transportation of property.

(2) Matters not covered.—Paragraph (1)—

(A) shall not restrict the safety regulatory authority of a State with respect to motor vehicles, the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous nature of the cargo, or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization;

\* \* \* \* \* \*

(C) does not apply to the authority of a State or a political subdivision of a State to enact or enforce a law, regulation, or other provision relating to the price of for-hire motor vehicle transportation by a tow truck, if such transportation is performed without the prior consent or authorization of the owner or operator of the motor vehicle.

49 U.S.C. § 14501(c)(1) & (2) (1996).

In the general definitions section of the Motor Carriers, Water Carriers, Brokers, and Freight Forwarders' part of the Act a "motor carrier" is defined as "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(12). A "motor private carrier" is defined as "a person, other than a motor carrier, transporting property by motor vehicle when—(A) the transportation is as provided in section 13501 of this title [interstate transportation]; (B) the person is the owner, lessee, or *bailee* of the property being transported; and (C) the property is being transported for sale, lease, rent, or *bailment* or to further a commercial enterprise." 49 U.S.C. § 13102(13) (emphasis added).[28] For-hire motor vehicle transportation by a tow truck fits within the definitions of both "motor carrier" and "motor private carrier" and unless exempted are within the scope of the Act's preemptive force.

While the city does not expressly counter this interpretation, it argues that local towing is traditionally a state activity that is outside the scope of the Act. In support of its position the city argues that 49 U.S.C. § 13506(b)(1) & (3) exempts towing from federal regulation. Section 13506 contains a number of specifically enumerated exemptions to the Secretary of Transportation and the Surface Transportation Board's general grant of jurisdiction over interstate commerce. Section 13506(a) lists fifteen types of motor vehicle transportation that are exempt under all circumstances including, among others, school buses, taxi cabs, most farm vehicles, newspaper delivery vehicles, the transportation of agricultural products, wood chips, and broken, crushed or powdered glass. Section 13506(b) provides that,

except to the extent the Secretary or Board, as applicable, finds it necessary to exercise jurisdiction to carry out the transportation policy of section 13101, neither the Secretary nor the Board has jurisdiction under this part over—(1) transportation provided entirely in a municipality, ... or (3) the emergency towing of an accidentally wrecked or disabled motor vehicle.

The city argues that § 13506(b) reflects the decision of Congress to decline to exer-

**28.** "Motor vehicle" means "a vehicle, machine, tractor, trailer, or semitrailer propelled or drawn by mechanical power and used on a highway in transportation...." 49 U.S.C. § 13102(14). A "highway" is defined as "a road, highway, street, and way in a State." 49 U.S.C. § 13102(9). The term " 'transportation' includes—(A) a motor vehicle ... related to the movement of passengers or property, or both, regardless of ownership or an agreement concerning use; and (B) services related to that movement, including arranging for, receipt, delivery, elevation, transfer in transit ... storage, handling ... and interchange of passengers and property." 49 U.S.C. § 13102(19).

cise federal jurisdiction over local emergency towing. *See Interstate Towing Ass'n v. City of Cincinnati,* 6 F.3d 1154 (6th Cir.1993) (interpreting 49 U.S.C. § 10526(b), the precursor to § 13506(b)); *426 Bloomfield Ave. Corp. v. City of Newark,* 904 F.Supp. at 369 (same). The cases cited by the city and Amicus Curiae, however, are of little assistance to the court. Although the court in *Interstate Towing* concluded that "on their faces, these subsections of the statute indicate Congress's intent not to preempt local towing services," 6 F.3d at 1158 n. 4, the case was decided before enactment of the legislation at issue here. The court in *426 Bloomfield Ave.,* the more recent case decided in light of the FAAA Act of 1994, expressed less certainty about Congress's intent. 904 F.Supp. at 369 ("The interpretation of [§ 10526(b) ] is particularly troublesome."). Although the court observed that "[a]t first blush, Congress appears to have exempted the towing activity regulated by the [City's Ordinance] from the scope of the [FAAA Act of 1994]," the court ultimately decided that the statutory scheme was a "linguistic morass" and turned to the legislative history of the Act along with policy considerations to assist in its interpretive task. *Id.* at 370.

This court concludes that Congress removed any statutory uncertainty about its intent to preempt state and local towing regulations with the passage of the ICC Termination Act of 1995. That Act added a new subsection (c)(2)(C) specifically allowing state and local regulations relating to the price of non-consensual towing. The addition of § 14501(c)(2)(C) confirms congressional intent in § 14501(c)(1) to preempt state and local towing regulations. If Congress had not intended to preempt such regulations the addition of § 14501(c)(2)(C) to cancel this preemptive force would have been unnecessary.

Reading § 13506(b) together with § 14501(c), the court concludes that Congress has deregulated portions of the intrastate towing industry. Pursuant to 49 U.S.C. § 13506(b) the Secretary of Transportation and the Surface Transportation Board may not exercise jurisdiction over intrastate towing unless they find it necessary to do so to carry out the interstate transportation policy of the United States Government as expressed in 49 U.S.C. § 13101. Pursuant to 49 U.S.C. § 14501(c)(1) states and localities may not enact regulations related to a price, route, or service of a tow truck except as provided in subsection (c)(2)(A) (allowing state regulatory authority with respect to motor vehicles, State authority to impose highway route controls based on size or weight of the motor vehicle or the hazardous nature of the cargo, or State authority to require minimum amounts of financial responsibility), and subsection (c)(2)(C) (allowing state and local regulations related to the price of non-consensual towing).

### 2. The Legislative History

Any lingering ambiguity about the scope of § 14501(c) is resolved by the legislative history of the ICC Termination Act. *See Texas Manufactured Housing Ass'n v. City of Nederland,* 905 F.Supp. at 376 ("Express preemptive language may be found on the face of a statute [or] in its legislative history ...."). Although the parties cite numerous documents constituting virtually every reference to tow trucking in the legislative history of the 103rd and 104th Congresses, the court finds the legislative history of the ICC Termination Act of 1995 most instructive of legislative intent. *See* S.Rep. No. 176, 104th Cong., 1st Sess. 27–28, 108 (1995); H.R.Rep. No. 311, 104th Cong., 1st Sess. 119–20 (1995), *reprinted in* 1995 U.S.Code Cong. & Admin.News 793, 831–32; H.R.Conf.Rep. No. 422, 104th Cong., 1st Sess. 218–19 (1995), *reprinted in* 1995 U.S.Code Cong. & Admin.News 793, 903–04. The House Report clearly states Congress's intent to preempt State and local tow truck regulations:

> This section preserves existing prohibitions against intrastate regulation of intercity bus rates, scheduling, and discontinuances or reductions in service; the rates, routes, or services of freight forwarders and transportation brokers; and trucking prices, routes, or services. The Section makes two changes to the existing provision. First, it clarifies in subsection (b) that transportation brokers are treated the same as freight forwarders for the purposes of State preemption.

Second, it adds a new provision as subsection (c)(2)(C) which provides a new exemption from the preemption of State regulation of intrastate transportation relating to the price of non-consensual tow truck services. This is only intended to permit States or political subdivisions thereof to set maximum prices for non-consensual tows, and is not intended to permit reregulation of any other aspect of tow truck operations.

The Committee had been asked to go farther and permit States and political subdivisions thereof to reregulate all aspects of non-consensual tow truck services. The Committee provision struck a balance between the need to protect consumers from exorbitant towing fees and the need for a free market in towing services.

H.R.Rep. No. 311, 104th Cong., 1st Sess. 119–20 (1995), *reprinted in* 1995 U.S.Code Cong. & Admin.News 793, 831–32. The Report manifests Congress's intent that while state and local governments are not preempted from regulating the price of non-consensual towing, they are otherwise prevented from regulating in areas related to a price, route, or service of intrastate towing. *See also* 141 Cong.Rec. H15602 (1995) (statement of Rep. Rahall) ("The pending legislation would restore the local authority to engage in regulating the prices charged by tow trucks in non-consensual towing situations. Regulation of routes and services, as well as regulation of consensual towing, would still be preempted.").

Congress subsequently adopted the House version of the bill. In so doing Congress rejected a Senate amendment that would have exempted "the price *and related conditions*" of non-consensual towing from federal preemption but that still would have preempted all other tow truck regulations related to a price, route, or service.[29] The final House Conference Report states:

29. *See* S.Rep. No. 176, 104th Cong., 1st Sess. 27–28, 108 (1995) ("Subsection (c), imported from 49 U.S.C. § 11501(h), would cover trucking prices, routes, and services. The preemption would be narrowed, however, to allow State and local governments to regulate the price and relat-

Chapter 145—Federal–State Relations

## PREEMPTION OF STATE REGULATION

House Bill

Sec. 14501. Federal authority over intrastate transportation. This section preserves existing prohibitions against intrastate regulation of intercity bus rates, scheduling, and discontinuances or reductions in service; the rates, routes, or services of freight forwarders and transportation brokers; and trucking prices, routes, or services. The section provides a new exemption (from the preemption of State regulation of intrastate regulation) relating to the price of transportation provided by tow trucks when the transportation is performed without the prior consent or authorization of the owner or operator of the vehicle.

Senate Amendment

Sec. 14501. (Federal authority over intrastate transportation) incorporates existing prohibitions against intrastate regulation. The preemption would be narrowed, however, to allow State and local governments to regulate the price and related conditions of transportation provided by tow trucks if the transportation is performed at the request of a law enforcement agency or without the prior consent or authorization of the owner or operator of the vehicle.

Conference substitute

The Conference adopts the House provision....

\* \* \* \* \* \*

Non-consent tows occur when vehicle owners/operators are unable to give their voluntary consent to the tow. Non-consent tows typically occur in emergency situations and when tows are made from private property. The tow truck provision in this section is designed to allow States

ed conditions of non-consensual tows by tow-truck operators, so as to preclude exorbitant prices and unreasonable conditions from being imposed on unwilling parties in such situations.").

and local governments to regulate the price of tows in non-consent cases.... H.R.Conf.Rep. No. 422, 10th Cong., 1st Sess. 218–19 (1995), *reprinted in* 1995 U.S.Code Cong. & Admin.News 793, 903–04.

### 3. *Case Law*

The city argues that the weight of persuasive case law supports its position that Congress did not intend to preempt state and local tow truck regulations.[30] The cited cases are of limited precedential value, however, because they were decided before the enactment of the ICC Termination Act of 1995. *426 Bloomfield Ave. Corp. v. City of Newark*, 904 F.Supp. 364 (D.N.J.1995), is illustrative of the limited value of the case law decided before the enactment of the ICC Termination Act. The court there concluded that the enactment of the FAAA Act of 1994 did not preempt local tow truck regulations. The court based its decision on four grounds: (1) the FAAA Act did not mention tow trucks; (2) the structure of the Interstate Commerce Act as a whole (and in particular, § 10526(b)), although a "linguistic morass," militated against preemption; (3) the legislative history of the FAAA Act was ambiguous; and (4) policy considerations related to the lack of market controls to prevent extortionate pricing in an unregulated nonconsensual towing environment showed that preemption was "unfathomable." *Id.* at 368–74. The ICC Termination Act resolves each of these four grounds. The ICC Termination Act and its legislative history both specifically demonstrate Congress's intent to preempt state and local towing regulations, thereby resolving any ambiguity in the structure of the Interstate Commerce Act as a whole. The *426 Bloomfield* Court's other concerns are addressed by the ICC Termination Act's enactment of subsection (c)(2)(C) (allowing state and local price regulation of nonconsensual towing), where Congress "struck a balance between the need to protect consumers from exorbitant towing fees and the need for a free market in towing services." H.R.Rep. No. 311, 104th Cong., 1st Sess. 119–20 (1995), *reprinted in* 1995 U.S.Code Cong. & Admin.News 793, 831–32.

### 4. *Conclusion*

The court concludes that 49 U.S.C. § 14501(c) expresses Congress's intent to preempt state and local regulations related to a price, route, or service of intrastate tow trucking. The legislative history of the ICC Termination Act of 1995 confirms congressional intent to preempt, and nothing in the structure of the Interstate Commerce Act or the relevant case law persuades the court otherwise. Because the court concludes that Congress intended to preempt state and local regulations under § 14501(c) "the only remaining question is whether a particular [regulation] intrudes into the federal pale." *New Hampshire Motor Transport Ass'n v. Town of Plaistow*, 836 F.Supp. 59, 63 (D.N.H.1993). Accordingly, the court must determine whether Code of Ordinances §§ 8–102, 8–115(c) & (d), and 8–135 through 8–142 relate to a price, route, or service of the plaintiffs.

### B. Do sections 8–102, 8–115(c) & (d), and 8–135 through 8–142 of the wrecker ordinance relate to a price, route, or service of a tow truck?

Section 14501(c) provides that "a State [or] political subdivision of a State ... may not enact or enforce a law, regulation, or other provision having the force and effect of law

---

30. *See Brumfield Towing Serv., Inc. v. City of Baton Rouge*, 911 F.Supp. 212 (M.D.La.1996) (concluding then-section 11501(h) does not preempt local tow truck ordinance); *426 Bloomfield Ave. Corp. v. City of Newark*, 904 F.Supp. 364 (D.N.J.1995) (same); *Giddens v. City of Shreveport*, 901 F.Supp. 1170 (W.D.La.1995) (holding that § 11501(e) did not apply to local tow truck ordinance); *but see Auto. Insurers Bureau of Massachusetts v. Commissioner of Insurance*, 420 Mass. 599, 650 N.E.2d 1234, 1240 (1995) ("As of January 1, 1995, the Federal government has preempted the ability of the States to regulate rates for towing motor vehicles. 49 U.S.C. § 11501(h)"); *Towing and Recovery Professionals v. City of Baton Rouge*, No. 413,660 (19th Judicial Dist.Ct., Parish of East Baton Rouge, March 1995) ("This court finds that as tow trucks are considered motor carriers by the U.S. Department of Transportation, the Interstate Commerce Commission, Louisiana law, and the Louisiana Public Service Commission, then tow trucks are to be considered motor carriers under the [FAAA] [A]ct in question."), attached as Appendix 3 to Plaintiffs' Brief in Support of Summary Judgment, Docket Entry No. 10.

related to a price, route, or service of any motor carrier ... or any motor private carrier ... with respect to the transportation of property." 49 U.S.C. § 14501(c)(1).

Congress modeled this preemptive provision on virtually identical preemptive language found in the Airline Deregulation Act of 1978, 49 U.S.C. § 1305(a)(1) ("[A] State [or] political subdivision may not enact or enforce a law, regulation, or other provision having the force and effect of law related to rates, routes, or services of an air carrier....") (recodified as 49 U.S.C. § 41713(b)(1)).[31] *Vieira v. United Parcel Serv.*, 1996 WL 478686, at *1 (N.D.Cal. Aug. 5, 1996); *In re St. Johnsbury Trucking Co., Inc.*, 199 B.R. 84, 87 (S.D.N.Y.1996). Because courts have given the broadest possible scope to this equivalent preemptive clause in the ADA,[32] § 14501(c)(1) should also be accorded a broad preemptive reach.[33] In *Morales* the Court held that the ADA preempts any state or local law that has "a connection with or reference to" airline rates, routes, or services. *Id.* 504 U.S. at 384, 112 S.Ct. at 2037. Section 14501(c) likewise preempts any state or local law that has "a connection with or reference to" a tow trucking price, route, or service.

The court concludes that each of the challenged ordinance provisions has "a connection with or reference to" a price, route, or service of the plaintiffs. Section 8–102 establishes five wrecker service areas in the city, while section 8–115(c) & (d) limits all non-consensual towing, whether from private

property or from the scene of an accident or arrest, to the holder of a permit within the service area of the tow. By limiting the streets and highways on which plaintiffs may operate their tow trucks these provisions have a connection with or reference to a route of the plaintiffs. Furthermore, the service area restrictions also regulate activity that has a connection with or reference to a tow trucking service because they deny plaintiffs the opportunity to offer any towing services to private property owners or the police in certain areas of the city.

The court also concludes that §§ 8–115(c) & (d) and 8–135 through 8–142, which restrict non-consensual towing from the scene of an accident or arrest to the holder of an E–Tag, have a connection with or reference to a tow trucking service. These provisions restrict the entry of plaintiffs into the pool of operators eligible to compete for police emergency towing and prevent them from providing any emergency towing services except in limited circumstances.[34] A bar to market participation for some tow truck operators clearly reaches the essence of their ability to provide towing services. *See* H.R.Rep. No. 311, 104th Cong., 1st Sess. 120 (1995), *reprinted in* 1995 U.S.Code Cong. & Admin.News 793, 833.

## VII. *Exceptions to Preemption*

Because §§ 8–102, 8–115(c) & (d), and 8–135 through 8–142 of the wrecker ordinance relate to a price, a route, or a service of the plaintiffs, they are preempted by federal law

**31.** When § 1305(a)(1) was recodified as 49 U.S.C. § 41713, Congress modified the statutory language to read "related to a price, route, or service." In doing so Congress intended no substantive change to existing law. H. Conf.Rep. No. 677, 103rd Cong., 2nd Sess. 83–84 (1994), *reprinted in* 1994 U.S.Code Cong. & Admin.News 1676, 1755–56. *See also Trujillo v. Am. Airlines, Inc.*, 938 F.Supp. 392, 393–94 (N.D.Tex.1995), *aff'd*, 98 F.3d 1338 (5th Cir.1996) (Table opinion No. 95–11198).

**32.** *See Morales v. Trans World Airlines*, 504 U.S. at 381–85, 112 S.Ct. at 2036–37 (stating that the language barring enactment or enforcement of state or local laws "express[ed]" a broad preemptive purpose," which has been described as "conspicuous for its breadth" in the context of the Employee Retirement Income Security Act of 1974 (ERISA)); *Harris v. Am. Airlines, Inc.*, 55

F.3d 1472, 1476 (9th Cir.1995); *Continental Airlines, Inc. v. Kiefer*, 920 S.W.2d 274, 283 (Tex. 1996).

**33.** *See Vieira*, 1996 WL 478686, at * 1; *In re St. Johnsbury Trucking*, 199 B.R. at 87. *See also* H.R. Conf.Rep. No. 677, 103rd Cong., 2d Sess. 83 (1994), *reprinted in* 1994 U.S.Code Cong. & Admin.News 1676, 1755 ("[T]he conferees do not intend to alter the broad preemption interpretation adopted by the United States Supreme Court in *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 199 L.Ed. 157 (sic), 112 S.Ct. 2031 (1992).").

**34.** *See* Code of Ordinances § 8–115(d)(1)–(3); Schmalriede Affidavit, Exhibit 1 to Plaintiffs' Motion for Leave to Amend Complaint to Add Additional Plaintiffs; Johnson Affidavit, Exhibit 2 to Plaintiffs' Motion for Leave to Amend.

unless they fall within one of the exceptions to preemption under 49 U.S.C. § 14501(c)(2).[35]

The city argues that the wrecker ordinances at issue fall within the congressionally created exception to preemption that allows state safety regulation of motor vehicles. *See* 49 U.S.C. § 14501(c)(2)(A) (excepting "the safety regulatory authority of a State with respect to motor vehicles" from the general preemption rule). Specifically, the city argues that the ordinance provisions limiting the number of emergency towing permits[36] and restricting the operation of emergency wreckers to geographical service areas within the city[37] are legitimate safety regulations enacted by the city.

As the court interprets subsection (c)(2)(A) in light of subsection (c)(1), state and local towing regulations "related to a price, route, or service" of a tow truck, and thus normally preempted by subsection (c)(1), are not preempted if they fall within one of the exceptions in subsection (c)(2)(A)—state regulatory authority over motor vehicle safety, state highway route controls based on size and weight of the motor vehicle or the hazardous nature of the cargo, or state financial responsibility requirements. Because the court has concluded that the challenged wrecker ordinance provisions relate to a price, route, or service of the plaintiffs, the court must determine whether the challenged provisions fall within the exception for State safety regulatory authority under subsection (c)(2)(C).

■ When determining the scope of a statute courts are to look at its actual language. *Consumer Product Safety Comm'n*

*v. GTE Sylvania, Inc.*, 447 U.S. 102, 107–09, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). On its face subsection (c)(2)(A) excepts only "State" regulatory authority. "The term 'State' means the 50 States of the United States and the District of Columbia" for purposes of this statute. 49 U.S.C. § 13102(18). As an initial matter the parties question whether this language limits safety regulatory authority to "a State" and not the "political subdivisions of a State."

Although, unlike 49 U.S.C. § 14501(c)(2)(C), subsection (c)(2)(A) expressly refers only to "State" regulatory authority, that does not mean that this subsection of the statute does not also allow municipal regulation. In *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 607–09, 611–12, 111 S.Ct. 2476, 2483, 2485, 115 L.Ed.2d 532 (1991), the Court held that the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), although explicitly permitting only "a State" to regulate pesticides subject to certain federal restrictions, 7 U.S.C. § 136v(a),[38] and defining "State" as "a State, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, and American Samoa," 7 U.S.C. § 136(aa), did not limit the State's power to redelegate its authority to a political subdivision. 501 U.S. at 607–09, 611–12, 111 S.Ct. at 2483, 2485.

■ The Court found the language of sections 136(aa) and 136v to be "wholly inadequate to convey an express preemptive intent." *Id.* at 607–09, 111 S.Ct. at 2483. "Mere silence," the Court said, would not "suffice to establish 'a clear and manifest purpose' to pre-empt local authority." *Id.*

---

**35.** In their supplemental motion for summary judgment plaintiffs acknowledge that the city is now allowed under 49 U.S.C. § 14501(c)(2)(C) to enforce Code of Ordinances § 8–214 (regulating the price of non-consensual towing) and thus have withdrawn their motion for summary judgment as to that section of the ordinance. Because subsection (c)(2)(C) clearly allows the city to regulate the price of non-consensual towing, the city's motion for summary judgment and first amended motion for summary judgment will be granted as to Code of Ordinances § 8–214.

**36.** Code of Ordinances §§ 8–115(d) and 8–135 through 8–142.

**37.** Code of Ordinances §§ 8–102, 8–115(c), (d).

**38.** 7 U.S.C. § 136v provides, in part:

(a) A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.

(b) Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.

(quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 229–31, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). The Court also observed that it is well established that units of local government are created to exercise such powers as a state may entrust to them in its absolute discretion. Consequently, "the exclusion of political subdivisions cannot be inferred from the express authorization to the 'State[s]' because political subdivisions are components of the very entity the statute empowers." *Id.* The term "State" is not "self-limiting." *Mortier*, 501 U.S. at 611–12, 111 S.Ct. at 2485. To the contrary, the express delegation of regulatory authority to a state may well mean that it is permitted to redelegate its authority to a "political subdivision[ ] either specifically or by leaving undisturbed ... existing statutes that would otherwise provide [a] local government with ample authority to regulate." *Id.*

■ The court concludes that 49 U.S.C. § 14501(c)(2)(A) permits municipalities to enact safety regulations related to a price, route, or service of a tow truck if a State has redelegated its regulatory authority to its political subdivisions. The record is devoid of any congressional intent to limit safety regulatory authority in subsection (c)(2)(A) to the states, *see Mortier*, 501 U.S. at 607–09, 111 S.Ct. at 2483, and nothing in the structure of the statute prevents the reading the court adopts. Moreover, there is no evidence or congressional findings that municipal safety regulations would interfere with Congress's concern for competitiveness in tow trucking. *Cf. City of Charleston v. Gov't Employees Ins. Co.*, 869 F.Supp. 378, 386 (D.S.C.1994) (holding that nothing in the history of the McCarran–Ferguson Act, 15 U.S.C. §§ 1011, 1012, which removed all Commerce Clause limitations on "a State" to regulate and tax the business of insurance, or its overall structure, is inconsistent with allowing states to delegate taxing authority to municipalities).

■ The court's examination of other regulatory exceptions listed in subsection (c)(2)(A) confirms the conclusion that Congress' use of the term "a State" is not limiting. For example, the exception allowing "a State to impose highway route controls or limitations based on ... the hazardous nature of the cargo" refers to the Hazardous Materials Transportation Authorization Act (HMTA Act) of 1994, 49 U.S.C. §§ 5101–5127. The structure of the HMTA Act makes clear that a municipality may exercise authority over the routing of hazardous materials shipments by motor carrier if it complies with the strict standards prescribed by the Act and the Secretary of Transportation. *See* 49 U.S.C. §§ 5112, 5125. *See also Jersey Cent. Power & Light Co. v. Township of Lacey*, 772 F.2d 1103, 1112–13 (3d Cir.1985), *cert. denied*, 475 U.S. 1013, 106 S.Ct. 1190, 89 L.Ed.2d 305 (1986); *City of New York v. U.S. Dep't of Transp.*, 715 F.2d 732 (2d Cir.1983), *appeal dismissed and cert. denied*, 465 U.S. 1055, 104 S.Ct. 1403, 79 L.Ed.2d 730 (1984); *Nat'l Tank Truck Carriers, Inc. v. City of New York*, 677 F.2d 270 (2d Cir.1982). If municipalities were prevented by subsection (c)(2)(A) from regulating the routes of motor carriers of hazardous property, the legislative intent of the HMTA Act would be frustrated. The court concludes that Congress did not intend this result, but failed to recognize the possible impact of its omission of municipalities from subsection (c)(2)(A).

■ Accordingly, the court concludes that the State of Texas is permitted to redelegate its authority to a "political subdivision[ ] either specifically or by leaving undisturbed ... existing statutes that would otherwise provide [a] local government with ample authority to regulate." *See Mortier*, 501 U.S. at 612, 111 S.Ct. at 2485. Here, both situations are present. First, the existing City Code of Ordinances was enacted pursuant to the city's powers to regulate as an arm of the State. *See Town of Ascarate v. Villalobos*, 148 Tex. 254, 223 S.W.2d 945, 950 (1949) ("A municipal corporation is considered an arm of the State, and has the police power to protect the safety of the public, and in the exercise of its police power to protect the public from traffic hazards."). *See also City of College Station v. Turtle Rock Corp.*, 680 S.W.2d 802, 805 (Tex.1984) ("A city may enact reasonable regulations to promote the health, safety, and general welfare of its people."). Second, the State of Texas passed legislation in

response to the FAAA Act of 1994 granting municipalities permission to "regulate the operation of a tow truck to the extent allowed by federal law." Tex.Rev.Civ.Stat. Ann. art. 6675c, § 11(a) (Vernon Supp.1996). *See City of Irving v. Dallas/Fort Worth Int'l Airport Bd.*, 894 S.W.2d 456, 465 (Tex. App.—Fort Worth 1995, writ denied) ("A municipality is merely a department of the state, and the state may withhold, grant or withdraw powers and privileges as it sees fit.") (quotation omitted). Under either source of authority the city is empowered to regulate motor vehicle safety, to control highway routes based on size and weight of the motor vehicle or the hazardous nature of the cargo, or to impose financial responsibility requirements. The court must therefore decide whether the challenged ordinance provisions are safety regulations passed pursuant to the city's regulatory authority under subsection (c)(2)(A).

Congress has made it clear that it "do[es] not intend the regulatory authority that States may continue to exercise ... to be used as a guise for continued economic regulation as it related to prices, routes or services." H.Conf.Rep. No. 677, 103rd Cong., 2d Sess. 84 (1994), *reprinted in* 1994 U.S.Code Cong. & Admin.News 1676, 1756. Courts must determine whether a particular ordinance, although denoted as safety-related, is in reality an economic regulation related to routes or services of a tow truck. *Cf. New Hampshire Motor Transport Ass'n v. Town of Plaistow,* 836 F.Supp. at 64 ("[W]hen deciding an express preemption case, the Court is charged with the duty to discover any conflict between the statutes, not as written on their face, but as interpreted and applied in that case."). The precise question is whether Code of Ordinances

§§ 8–102, 8–115(c) & (d), and 8–135 through 8–142 are safety regulations or economic regulations.

 The city argues that the challenged ordinance provisions are safety regulations. The city cites City Council findings, made when revising the wrecker ordinance in 1982, that "[t]he provisions of this ordinance providing for permits [ (E–Tags) ] for wreckers which may go to the scene of accidents without being requested by a police officer or vehicle owner only when there is a public need and convenience for such permits are necessary due to the severe congestion and danger to the public that occurred when an unlimited number of wreckers were permitted to go to accident scenes."[39] The City Council also found that the service area restrictions are necessary "due to the severe problems which occurred when such wreckers were permitted to operate throughout the entire City resulting in severe congestion and danger to the public in areas where such wreckers congregated...."[40] The city argues the court should defer to these legislative findings.

In support of its legislative findings that the challenged ordinance provisions are safety-related the city also provides affidavits of two city employees.[41] Ellis Milam, the Administrative Manager of the Transportation Section in the Department of Finance and Administration, testified that E–Tag holders frequently speed to the scene of accidents, thereby creating traffic congestion and related safety risks to the general public. Tow truck operators do so in order to obtain the 6–10% commissions paid by automobile body and repair shops to wreckers who bring in vehicles from an emergency accident scene. This problem would be magnified if E–Tag

39. City of Houston Ordinance No. 82–2002, paragraphs (4) and (5) at pp. 2–3, Exhibit C to Appendix to Defendant's Motion for Summary Judgment, Docket Entry No. 17. These findings comprise 19 lines of the 101–page ordinance. This City Council finding traces its roots to the original 1957 Ordinance. The preamble to that Ordinance states that regulatory authority over the numbers of emergency tow trucks is necessary in part because "the large number of wreckers which converge upon the public street at the scene of a motor vehicle accident prevent and hinder the Police Department in its investigation

of the accident, and restricts the free flow of traffic along the street, thereby creating a nuisance and traffic hazard." City of Houston Ordinance No. 57–849, at p. 1, Exhibit B to Appendix.

40. City of Houston Ordinance No. 82–2002, at p. 3.

41. See Affidavit of Ellis E. Milam, Exhibit F to Appendix; Affidavit of Lt. Elden J. Smith, Exhibit G to Appendix.

limitations and service area restrictions were removed.[42] Houston Police Department Lieutenant Elden Smith, acting Captain in charge of the Traffic and Accident Division, stated that in 1982 he was a member of a police task force that made suggestions for revising towing operations in the city with respect to issues of traffic safety and mobility. The task force's recommendations were among those incorporated in the 1982 revision of the Ordinance. Lt. Smith testified that E–Tag and service · area restrictions were primarily based on traffic safety considerations:

It has been evident for many years, and confirmed on numerous occasions by my personal observations, that those engaged in the emergency wrecker business tend to congregate rapidly at accident scenes in large numbers, often reaching the scene prior to arrival of a police cruiser. Upon overhearing radio reports of accidents, it is typical for wrecker drivers to proceed at high speeds, often in excess of the speed limit, to reach the scene in order to obtain a tow. . . .

The study group advised the City Council that some limitations on the number of wreckers permitted to conduct emergency, non-consent towing would be essential to preserve the safety of the motoring public. Similarly, we felt that further restricting emergency wrecker license holders to specific zones in the City would at least partially alleviate the hazards to traffic safety. Prior to the adoption of the restricted zone provision, it was not at all uncommon for wrecker drivers to race at high speeds to an accident scene many miles away. In addition, the tendency of emergency wrecker vehicles to congregate in large numbers at accident scenes can cause extensive traffic congestion, especially during peak hours, resulting in potentially hazardous distraction to other motor vehicle drivers.[43]

Plaintiffs respond that the E–Tag provisions as actually applied by the city are used to regulate market participation for purposes unrelated to safety. In support of their argument plaintiffs provide the Director of Finance and Administration's October 1992 Report on 1991 Emergency Wrecker Permits (the Report) that finds a "public need and convenience" for the issuance of additional E–Tags in 1992. Although it is a close question, after carefully evaluating the Report and the practice used by the city in determining how many E–Tags are issued and to whom, the court agrees with plaintiffs that the E–Tag provisions as applied primarily regulate market participation for purposes other than safety, and are thus preempted.

Code of Ordinances §§ 8–135 through 8–142 restrict the number of E–Tags by requiring the Director of Finance and Administration (the director) to find a "public need and convenience" before granting any additional E–Tags. Although the city argues that the public need and convenience limitation is related to safety, the court concludes that the city's primary motivations are related to economics, community development, and social policy. In the first step of the E–Tag application process the director makes an initial determination of public need and convenience for additional E–Tags in a service area by considering four criteria: (1) the time police officers must wait for emergency wreckers to respond to a police dispatch; (2) the need for additional emergency wreckers to remove vehicles from the scenes of accidents and custodial arrests; (3) the effect of additional emergency wreckers on traffic congestion; and (4) any other factors the director finds relevant.[44] The third criteria refers to the city's proffered safety rationale about wreckers congregating at accident scenes and related traffic congestion and driving hazards. However, in his actual findings of public need and convenience for additional E–Tags, the director includes only one passing, benign reference to "traffic congestion" in the Report:

*Traffic Congestion.* Testimony provided by law enforcement officials indicates that the addition of E-tags would not adversely affect traffic congestion. Additionally, evidence was provided by applicants that indi-

---

**42.** Milam Affidavit at p. 2.

**43.** Smith Affidavit at p. 2.

**44.** Code of Ordinances § 8–135(b).

cates wreckers can assist at the scene of an accident by alerting oncoming traffic to an accident which is blocking traffic ahead. Furthermore, it is common practice for the officer at the scene of an accident to send out a disregard notice over the radio when sufficient E-tags have responded, thereby limiting the number on the scene.[45]

The Report concentrates on the need to reduce delays in emergency wrecker response time resulting from a shortage of E-Tag operators and to address certain "other relevant factors" identified by the city. The "other relevant factors" include: (1) meeting the increased demand for towing services resulting from rapid population growth and increased crime prevention efforts; (2) combating the development of monopolies and other anticompetitive tendencies in the E-Tag industry; (3) promoting economic and community development in the five service areas; and (4) increasing demographic diversity in the E-Tag industry with respect to race, ethnicity, and gender.[46] The Report makes it clear that these "other relevant factors" were important, if not paramount, considerations in the ultimate finding that the issuance of additional E-Tags met the public need and convenience.[47]

The director uses the "other relevant factors" to address various city economic, community development, and social policies. First, the Report concludes that the monopolistic and anticompetitive tendencies developing in the E-Tag industry support the issuance of additional permits.

*Monopoly Characteristics of Industry.* Evidence indicates monopolies exist in the wrecker industry and that issuing additional E-Tags to promote the growth of more businesses in an industry that has monopolistic tendencies meets the public need and convenience. Increased competition will not only broaden the public's choice in who provides service to them, but will also en-

courage more efficient provision of E-Tag service.

*Market Price/Lease Fees.* The value of the tag itself is far higher than the cost to the operator of acquiring and obtaining the permit.... The high market price and lease fees that permit holders obtain for their permits indicate that in attempting to control the number of E-Tags which appear on the scene of an accident, an E-Tag holder (not necessarily a driver) may be earning excessive profits because of the inadvertent barriers to entry created by limiting the number of tags issued. Such conditions are contrary to the public need and convenience because the level of service provided could be less than that which would be provided in an open, competitive market. Therefore the public need and convenience would best be served by issuing additional E-Tag permits.[48]

The Report also concludes that the city's policies of promoting economic and community development and demographic diversity based on race, ethnicity, and gender support the issuance of additional E-Tags.

*Economic and Community Development.* The nature of operating an E-Tag requires relatively low initial investment and generates revenue largely within the area the business is located. Additionally, it can provide a means for employment of additional members of the community. Operating an E-Tag is a viable means of promoting economic and community development in disadvantaged communities, as well as economic growth within the city limits. In consideration of the community service provided by applicants, it follows that the public need and convenience could be served by issuing additional E-Tags.

*Demographics.* A comparison of the demographic composition of permit holders in each zone with respect to race, ethnic

---

45. Report on 1991 Emergency Wrecker Permits, Appendix 1 to Plaintiffs' Response to Amicus Curiae Brief (Docket Entry No. 37), at p. 5. The director subsequently concluded that "the public need and convenience will not be impacted adversely in this respect by the issuance of additional permits." Report on 1991 Emergency Wrecker Permits at p. 7.

46. Report on 1991 Emergency Wrecker Permits at pp. 6–7.

47. Report on 1991 Emergency Wrecker Permits at pp. 6–11.

48. Report on 1991 Emergency Wrecker Permits at p. 10.

background, and gender with the demographics of the population in the zone substantiates the claims made by applicants that some groups are under-represented....[49]

Once the city determines that the public need and convenience require the issuance of additional E–Tags, the second step in the application process is to select the most qualified applicants available. In 1992 the director determined that a total of sixteen additional E–Tags were required to meet the public need and convenience.[50] Each applicant had to appear at a hearing and present evidence that he or she was qualified to receive one or more of the E–Tags to be issued.[51] The director then determined which of the E–Tag requests should be granted.[52] Factors considered by the director included: (1) the applicant's moral character and criminal history; (2) the applicant's ability to provide emergency towing in the service area; (3) the applicant's level of past experience; (4) the applicant's capability to provide service at all hours and during adverse weather conditions; (5) the applicant's special qualifications to serve the public in the requested service area, including the location of the applicant's business or the fact that the applicant is a minority business enterprise; (6) the applicant's past utilization of any currently held E–Tags; (7) the applicant's ability to purchase a tow truck and to sustain operation of the emergency towing service; (8) payment of ad valorem and other

taxes; and (9) any other factor the director finds relevant.[53]

The director followed a three-step elimination process in applying these nine criteria. In Step 1 each applicant was evaluated based on criteria 1 through 4 and 6 through 8.[54] Step 1 addressed all of the criteria that are even arguably related to safety, including the applicant's ability, experience, and past performance. Of the 149 initial applicants in Zones 2, 3, and 5, twenty-nine applicants, or 19% of the applicant pool, were eliminated in Step 1.[55] In Step 2 applicants were evaluated according to criteria 5 ("special qualifications") and 9 ("other relevant factors"). The "special qualification" considered in Step 2 was the location of the applicant's business within the relevant service area. "Other relevant factors" evaluated in Step 2 included promoting economic and community development, discouraging growth of monopolies, encouraging new entrants in the E–Tag industry, and discouraging the acquisition and selling of E–Tags primarily for monetary gain.[56] Fifty-nine applicants, or 40% of the initial applicant pool, were eliminated based on these economic criteria.[57] Finally, in Step 3 the remaining applicants were reevaluated according to criteria 5 and 9 as those criteria related to the city's policy of supporting minority business enterprises.[58] Twenty applicants, or 13% of the initial pool, were eliminated based on the city's policy of supporting minority enterprises.[59] Another thirteen ap-

49. Report on 1991 Emergency Wrecker Permits at p. 10.

50. Applicants in only three of the five geographical service areas (Zones 2, 3, and 5) were considered for the sixteen E–Tags. See Chart on Permit Selection Process, Figure 3 to Report on 1991 Emergency Wrecker Permits.

51. Code of Ordinances § 8–137.

52. Code of Ordinances § 8–139.

53. Code of Ordinances § 8–137(c).

54. Report on 1991 Emergency Wrecker Permits at pp. 14–15.

55. See Chart on Permit Selection Process, Figure 3 to Report on 1991 Emergency Wrecker Permits. In arriving at the figures for Step 1 the court did not consider those applicants who

failed to appear at the hearing or those applicants eliminated under Item 6 of Step 1 for "currently leasing permits to others" because they were eliminated on clearly non-safety related grounds. The court has arrived at its percentage figures for Steps 1–3 by dividing the total number of initial applicants (149) into the number of applicants eliminated in each step. For example, in Step 1 the court divided 149 into 29 to reach its 19% figure.

56. Report on 1991 Emergency Wrecker Permits at pp. 15–16.

57. See Chart on Permit Selection Process.

58. Report on 1991 Emergency Wrecker Permits at pp. 16–17.

59. See item 14 of Step 3, Chart on Permit Selection Process.

plicants, or 8% of the initial applicant pool, were eliminated based on related economic criteria.[60] Economic and social criteria were therefore responsible for eliminating ninety-two applicants, or at least 60% of the otherwise qualified E–Tag applicants.[61]

The court concludes that the city relies primarily on economic and social criteria in the E–Tag issuance process. As the Report itself states, the city's past regulation of E–Tags so fostered anti-competitive tendencies in the industry that in 1992 Houston had the second highest ratio of registered-vehicles-to-E-tags-issued of the major Texas cities.[62] The city then felt justified in using its regulatory powers to alleviate this recognized market failure while promoting various economic, community development, and social policies. Conspicuously lacking from the city's analysis is anything but a passing reference to the safety-related concerns urged by the city in its motion for summary judgment. The court concludes that the city has impermissibly used its delegated regulatory authority "as a guise for continued economic regulation" as it relates to the services of tow trucks by controlling market participation based on economic criteria unrelated to safety. Accordingly, the court concludes that Code of Ordinances §§ 8–135 through 8–142 are preempted by 49 U.S.C. § 14501(c). Plaintiffs' supplemental motion for summary judgment will be granted in part and the city's motion for summary judgment and first amended motion for summary judgment will be denied in part as to those ordinance provisions.

Although the court concludes that E–Tag provisions are preempted by § 14501(c)(1), the court's ruling does not preclude the city from enacting regulations designed to meet the legitimate safety concerns about wrecker congestion at the scene of accidents and arrests. For example, the city might choose to follow the lead of the other major cities in the state[63] and adopt a rotation system within geographical service areas that limits the number of emergency wreckers that can arrive at the scene of an accident or arrest. Such a system would address the city's safety related concerns without controlling market participation based on concerns unrelated to safety.

■ Because plaintiffs have failed to controvert the city's competent summary judgment evidence establishing that the geographical service area restrictions are safety related, the court concludes that these restrictions in Code of Ordinances § 8–102 and related portions of § 8–115(c) & (d) are safety regulations permissible under 49 U.S.C. § 14501(c)(2)(A). Accordingly, plaintiffs' supplemental motion for summary judgment will be denied in part and the city's motion for summary judgment and first amended motion for summary judgment will be granted in part as to those ordinance provisions.

## VIII. *Congressional Power Under the Commerce Clause*

The city argues that deregulation of intrastate towing under 49 U.S.C. § 14501(c) exceeds Congress's power to legislate under the Commerce Clause. Specifically, the city contends that Congress failed to make a finding that municipal towing has a "substantial effect on interstate commerce."

■ The Constitution delegates to Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes," U.S. Const., Art. I, § 8, cl. 3, and "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers...." Art. I, § 8, cl. 18. The Supreme Court has construed the Commerce Clause as a broad grant of regulatory author-

---

**60.** See Items 11–13, Chart on Permit Selection Process.

**61.** Although the five applicants eliminated under Item 6 of Step 1 for currently leasing permits to others were arguably removed based on economic considerations, they were not counted in these figures.

**62.** Report on 1991 Emergency Wrecker Permits at p. 8.

**63.** See Report on 1991 Emergency Wrecker Permits at p. 9 ("Most other cities surveyed [in the state] use a rotation system which effectively controls the number of wreckers at the scene which prohibits wreckers not called from the rotation list from remaining at the scene.").

ity to Congress. *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 275–77, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981). Congress's commerce power "is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the Constitution." *Id.* (citing *Gibbons v. Ogden*, 9 Wheat. 1, 196, 6 L.Ed. 23 (1824)).

In *United States v. Lopez*, —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the Court identified three categories of activity that Congress may regulate under the Commerce Clause: (1) "the use of channels of interstate commerce;" (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce;" and (3) "activities that substantially affect interstate commerce." —— U.S. at —— ——, 115 S.Ct. at 1629–30. With respect to the third category of activity the Court emphasized that it had repeatedly "upheld a wide variety of congressional Acts regulating intrastate economic activity where [it had] concluded that the activity substantially affected interstate commerce." *Id.* at ——, 115 S.Ct. at 1630.

 The court concludes 49 U.S.C. § 14501(c) does not violate the Commerce Clause. *See Kelley v. United States*, 69 F.3d 1503 (10th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1566, 134 L.Ed.2d 665 (1996). The activity at issue, regulation of intrastate motor carrier activities, falls squarely within the third category of activity cited in *Lopez*. In enacting this section Congress made express findings, set forth in § 601(a) of the FAAA Act of 1994, that state regulation of intrastate motor carrier activities substantially affects interstate commerce:

(1) [T]he regulation of intrastate transportation of property by the States has

 (A) imposed an unreasonable burden on interstate commerce;

 (B) impeded the free flow of trade, traffic and transportation of interstate commerce; and

 (C) placed an unreasonable cost on the American consumers; and

(2) certain aspects of the State regulatory process should be preempted.

Pub.L. No. 103–305, 108 Stat. 1569, 1605 (1994). *See also* H.R. Conf.Rep. No. 677, 103rd Cong., 2d Sess. 87 (1994), *reprinted in* 1994 U.S.Code Cong. & Admin.News 1676, 1759. The court concludes these findings are rational and reasonably adapted to the end permitted by the Constitution. *See Kelley*, 69 F.3d at 1508. *See also Hodel v. Virginia Surface Min. & Recl. Ass'n*, 452 U.S. at 275–77, 101 S.Ct. at 2360.

## IX. *Conclusion and Order*

For the foregoing reasons, Johnny L. Waltmon's Motion to Dismiss Houston Private Wrecker Association as Plaintiff (Docket Entry No. 27) is **DENIED**. Plaintiffs' Motion for Leave to Amend (Docket Entry No. 38) is **GRANTED in part and DENIED in part without prejudice**. Plaintiffs' Supplemental Motion for Summary Judgment (Docket Entry No. 25) is **GRANTED in part and DENIED in part**. Plaintiffs' Motion for Summary Judgment (Docket Entry No. 9) is **MOOT**. Plaintiffs' Motion for Permanent Injunction (Docket Entry No. 39) is **GRANTED in part and DENIED in part**. The City of Houston's Motion for Summary Judgment (Docket Entry No. 15) and First Amended Motion for Summary Judgment (Docket Entry No. 22) are **GRANTED in part and DENIED in part**.

The City of Houston is **ENJOINED** from enforcing Code of Ordinances §§ 8–135 through 8–142.

Remaining for consideration are the individual plaintiffs' damage claims and plaintiffs' challenges to ordinance §§ 8–161 through 8–165, which require operators of tow trucks to have a city-issued driver's license. By November 8, 1996, plaintiffs will provide the court and opposing counsel a description of the legal framework they will use to prove their damages, including citation to relevant authority, and the evidence, including the nature of any expert opinions, they will offer to support their damage claims and their challenges to §§ 8–161 through 8–165. Plaintiffs will also state what discovery they will seek and how much time they will require to complete discovery. By November 27, 1996, the city will provide the court and opposing counsel their response to the plain-

tiffs' proposed legal and factual methodology for proving damages and to the nature and scope of plaintiffs' suggested discovery.

The court will conduct a scheduling conference in Court Room 9–B, Ninth Floor, United States Courthouse, 515 Rusk Avenue, Houston, Texas, on December 5, 1996 at 4:00 p.m.